# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Vernon L. Ealy, | : | Civil No. 3:13-cv-2781 |
| Plaintiff | : | |
| | : | |
| v. | : | The Honorable James J. Munley |
| | : | |
| Warden Daniel S. Keen, et al | : | JURY TRIAL DEMANDED |
| Defendants | : | (Electronically Filed) |

## DEFENDANTS' BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Frank J. Lavery, Jr., Esquire
Attorney I.D. No. 42370
Jessica S. Hosenpud, Esquire
Attorney I.D. No. 307656
225 Market Street, Suite 304
P. O. Box 1245
Harrisburg, PA  17108-1245
Phone: (717) 233-6633
Facsimile: (717) 233-7003
flavery@laverylaw.com
jhosenpud@laverylaw.com
Attorneys for Defendants

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

I. Statement of Facts.................................................................1

II. Procedural History ...........................................................12

III. Questions Presented..........................................................13

IV. Standard of Review...........................................................14

V. Argument    ......................................................................17

A. Plaintiff has Failed to Allege Personal Involvement by Defendants Rouzer, Sterner-Lensbower and Sullen, and All Claims Against them Must be Dismissed ...........................................................17

B. Plaintiff's Claims for Declaratory or Injunctive Relief under Section 1983 and the RLUIPA Must be Dismissed .......................................19

C. Plaintiff's Claims for Damages Must be Dismissed as a Matter of Law and/or Judgment Entered in Favor of Defendants .............................20

1. Governmental Immunity Bars RLUIPA Claims for Money Damages, and Such Must be Dismissed .......................................20

2. Even were a Claim Stated Under RLUIPA, Defendants Are Entitled to Judgment in their Favor Thereupon .............................23

D. Plaintiff Has Failed to Allege a Claim under the First Amendment Free Exercise Clause, and/or Judgment be Entered in Favor of Defendants Thereupon ........................................................24

1. Failure to Employ a Full-Time Imam, and the FCJ Religious Services Policy, Do Not Violate the First Amendment Free Exercise Clause ....................................................26

2. Restrictions on Communal Prayer, Use of the Chapel, Supervision of Services and Necessary Cancellations or Delays

to Religious Programming Do Not Violate the First
Amendment Free Exercise Clause ............................................31

3. Failure to Provide a "Halāl Menu," Halāl Meat, and/or the Eid
Ul-Fitr Feast and Ramadan Accommodations Do Not Violate
the First Amendment Free Exercise Clause.............................36

4. No Cognizable First Amendment Free Exercise Claim May be
Made with Regard to the Islamic Materials Available in the FCJ
.................................................................................................43

E. Plaintiff has Failed to Make Any Viable Section 1983 Claims Under
the Establishment Clause ...................................................................45

1. The Failure to Employ a Sunni Muslim Imam and Use of
Volunteers to Provide Religious Services Does Not Violate the
Establishment Clause ...............................................................47

2. Restriction on Congregational Prayer, Supervision of Services
by the Chaplain, and Cancellation or Delays in Programming
do Not Violate the Establishment Clause .................................49

3. No Cognizable Establishment Clause Claim May be Made
Relating to the Menu Provided to Muslim Inmates, Either
During Holidays or Generally....................................................51

4. Jail Policies with Regard to Religious Materials do not violate
the Establishment Clause .........................................................51

F. Any Claims Under the Equal Protection Clause of the Fourteenth
Amendment Must be Dismissed and/or Judgment Entered in
Defendants' Favor and Against the Plaintiff.......................................52

G. Has Plaintiff Failed to State an Eighth Amendment Claim? ..............54

H. Defendants are Entitled to Qualified Immunity ..................................55

VI.    Conclusion  ...................................................................................................58

Certification of Counsel ...........................................................................................59

Certificate of Service ...............................................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Abdul-Akbar v. Watson</u>, 4 F.3d 195 (3d Cir. 1993)................................................20

<u>Allen v. Toombs</u>, 827 F.2d 563 (9th Cir. 1987) ...................................................... 28

<u>Anderson v. Creighton</u>, 483 U.S. 635,

    97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987)..................................................... 55, 56

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S. Ct. 2505,

    91 L. Ed. 2d 202 (1986) ...................................................................................16

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S. Ct. 1937,

    173 L. Ed. 2d 868 (2009) ............................................................................ 14, 15

<u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459

    U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)............................................16

<u>Banks v. Beard</u>, No. 3:CV-10-1480, 2013 U.S. Dist. LEXIS 140629

    (M.D. Pa. September 30, 2013) ...................................................... 20, 22, 41, 45

<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955,

    167 L. Ed. 2d 929 (2007) ............................................................................ 14, 15

<u>Bistrian v. Levi</u>, 696 F.3d 352 (3d Cir. 2012) ......................................................15

<u>Blanciak v. Allegheny Ludlum Corp.</u>, 77 F.3d 690 (3d Cir. 1996)........................20

<u>Borden v. Sch. Dist. of Twp. of E. Brunswick</u>, 523 F.3d 153 (3d Cir. 2008).........46

<u>Burns v. Pa DOC</u>, 642 F.3d 163 (3d Cir. 2011) ....................................................57

Celotex Corp. v. Catrett, 477 U .S. 317, 106 S. Ct. 2548,

    91 L. Ed. 2d 265 (1986) ....................................................................16

Chippollini v. Spencer Gifts, Inc., 814 F.2d 893 (3d Cir. 1987), *cert. dismissed*,

    483 U.S. 1052 (1987).......................................................................17

Cohen v. Wagner, No. 13-cv-674, 2014 U.S. Dist. LEXIS 6426 (E.D. Pa. January

    16, 2014) ........................................................................................22

County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S. Ct.

    3086, 106 L. Ed. 2d 472 (1989).......................................................46

Cruz v. Beto, 405 U.S. 319, 92 S. Ct. 1079,

    31 L. Ed. 2d 263 (1972) ............................................................ 24, 27

Cutter v. Wilkinson, 544 U.S. 709, 125 S. Ct. 2113,

    161 L. Ed. 2d 1020 (2005) ...............................................................47

D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364

    (3d Cir. 1992)..................................................................................56

DeHart v. Horn, 227 F.3d 47 (3d Cir. 2000) .........................................................52

Estelle v. Gamble, 429 U.S. .................................................................................54

Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970,

    128 L. Ed. 2d 811 (1994)..................................................................54

Fortes v. Harding, 19 F. Supp. 2d 323 (M.D. Pa. 1998).........................................20

Freedom of Religion Found, Inc. v. McCallum, 179 F. Supp. 2d 950 (W.D. Wis.

2002) ................................................................................................40

Garraway v. Lappin, No. 4:CV-10-1697, 2012 U.S. Dist. LEXIS 38712

(M.D. Pa. March 21, 2012) ................................ 17, 19, 28, 29, 33, 34, 35, 40, 44

Garraway v. Lappin, 490 Fed. Appx. 440 (3d Cir. 2012) .......................................45

Gittlemacker v. Prasse, 428 F.2d 1 (3d Cir. 1970) ..................................................27

Gould v. Beard, No. 07-0055, 2010 U.S. Dist. LEXIS 18883, 2010 WL 845566

(W.D. Pa. January 16, 2010)................................................................33

Graham v. Connor, 473 U.S. at 169........................................................................22

Hankins v. Beard, 2009 U.S. Dist. LEXIS 125619 ..................................................55

Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727,

73 L. Ed. 2d 396 (1982) .........................................................................55

Harter v. G.A.F. Corp., 967 F.2d 846 (3d Cir. 1992) .............................................17

Heim v. Moore, No. 11-0270, 2012 U.S. Dist. LEXIS 46786 (M.D. Pa. April 3,

2012) ............................................................................................ 21, 22

Hilfirty v. Shipman, 91 F.3d 573 (3d Cir. 1996) .....................................................17

Holman v. Hogue, No. 11-1269, 2013 U.S. Dist. LEXIS 42770

(W.D. Pa. February 15, 2013)....................................... 29, 30, 31, 32, 33

Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194,

82 L. Ed. 2d 393 (1984) .........................................................................54

Jefferson v. Wolfe, No. 04-44, 2006 U.S. Dist. LEXIS 46748, 2006 WL 1947721

  (W.D. Pa. July 11, 2006) ...................................................................19

Keevan v. Smith, 100 F.3d 644 (8th Cir. 1996).........................................................53

Kentucky v. Graham, 473 U.S. 159,

  87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985)............................................17

Mathis v. Manza, No. 11-450, 2012 U.S. Dist. LEXIS 17148

  (W.D. Pa. January 18, 2012) ......................................................... 47, 48

Matshushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574,

  106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)............................................16

Mayer v. Belichick, 605 F.3d 223 (3d Cir. 2010)....................................................15

McLaughlin v. Watson, 271 F.3d 566 (3d Cir. 2001) .............................................56

Modrovich v. Allegheny County, 385 F.3d 397 (3d Cir. 2004) ..............................46

Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S. Ct.

  2018, 56 L. Ed. 2d 611 (1978)............................................................18

Morris-El v. Menei, Civil No. 00-200J, 2006 U.S. Dist. LEXIS 32095,

  2006 WL 1455592 (W.D. Pa. May 22, 2006) ......................................33

O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400,

  96 L. Ed. 2d 282 (1987) ......................................................................25

Overton v. Bazzetta, 539 U.S. 126, 123 S. Ct. 2162,

  156 L. Ed. 2d 162 (2003) ......................................................... 26, 38, 39

Palmer v. Rustin, No. 10-0042, 2011 U.S. Dist. LEXIS 65678, 2011 WL 2489820

  (W.D. Pa. June 21, 2011) ...................................................................33

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008) ..............................15

Pogue v. Woodford, No. CIV S-05-1873, 2009 U.S. Dist. LEXIS 75943

  (E.D. Cal. August 25, 2009) ..............................................................34

Pressley v. Beard, 266 Fed. Appx. 216 (3d Cir. 2008)..................................... 19, 53

Pruden v. Schuylkill Cnty Prison Med. Staff, No. 3:CV-07-006, 2007 U.S. Dist.

  LEXIS 12353, 2007 WL 465522 (M.D. Pa. Feb. 6, 2007) ................................19

Rasul v. Rumsfeld, 433 F. Supp. 2d 58 (D.D.C. 2006) ..........................................57

Regan v. Taxation with Representation of Washington, 461 U.S. 540, 103 S. Ct.

  1997, 76 L. Ed. 2d 129 (1983)..............................................................40

Rendelman v. Rouse, 569 F.3d 182 (4th Cir. 2009)...............................................21

Rhodes v. Chapman, 452 U.S. 337, 69 L. Ed. 2d 59, 101 S. Ct. 2392 1981) .........26

Riley v. Beard, No. 08-1675, 2011 U.S. Dist. LEXIS 32640, 2011 WL 1204264

  (W.D. Pa. March 29, 2011).................................................................40

Riley v. DeCarlo, No. 11-537, 2012 U.S. Dist. LEXIS 137279

  (W.D. Pa. September 25, 2012) ................................................ 18, 19, 38, 39, 40

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) .............................................18

Romero v. Lappin, 2011 U.S. Dist. LEXIS 86435 ................................................57

Rouse v. Plantier, 183 F. 3d 192, 197 (3d Cir. 1999)..............................................54

Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ..... 55, 56

Sharp v. Johnson, 669 F.3d 144 (3d Cir. 2012) .......................................... 21, 25, 26

Shepard v. Peryam, 657 F. Supp. 2d 1331 (D.D. Fl. August 20, 2009) .................29

Smith v. Kyler, 295 F. App'x 479 (3d Cir. 2008) ....................................... 27, 28, 35

Sossamon v. Texas, 560 F.3d 316 (5th Cir. 2009), *aff'd*, 131 S. Ct. 1651,

   179 L. Ed. 2d 700 (2011) ...................................................................22

Sturm v. Clark, 835 F.2d 1009 (3d Cir. 1987).........................................................14

Sutton v. Rasheed, 323 F.3d 236 (3d Cir. 2003) ....................................................20

Tanafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144 (3d Cir. 2002)..............46

Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254,

   96 L. Ed. 2d 64 (1987) ................................................................. 25, 52

United States v. Sedaghaty, 728 F. 3d 885 ............................................................43

Washington v. Klem , 497 F.3d 272 (3d Cir. 2007) ...............................................23

Watkins v. Horn, No. CIV.A. 96-4129, 1997 U.S. Dist. LEXIS 13844, 1997 WL

   566080 (E.D. Pa. Sept. 5, 1997) ......................................................19

Williams v. Morton, 343 F.3d 212 (3d Cir. 2003)...................................................37

Young v. Beard, 284 Fed. Appx. 958 (3d Cir. 2008) ..............................................48

**Acts, Rules, Statutes**

42 U.S.C. § 1983 ......................................................... 12, 17, 18, 19,  20

42 U.S.C. § 2000cc ................................................................................................12

Fed. R. Civ. P. 12(b)(6)..........................................................................................14

Fed. R. Civ. P. 56(a)...............................................................................................16

I.    **Facts**

Defendants incorporate herein by reference their Statement of Material Facts, filed April 28, 2014, and the Appendix of Exhibits filed therewith, as if fully set forth herein.   As recounted in such Statement, Franklin County Jail (FCJ) policy does not require inmates to participate in religious services, nor does it favor the worship of one denomination over another, rather providing the option and means for inmates to follow their faith during incarceration without requiring them to do so.  (See Doc. 17, Statement of Material Facts [hereinafter "SMF"] ¶ 75.) To that end, the FCJ employs the services of a single full-time religious Chaplain through Prison Ministries, at a minimal cost of eighteen-thousand dollars per year, whose duties include assuring equal status and protection for all represented religions, and organizing and maintaining a schedule of religious programs and activities catering to each.  (See SMF ¶¶ 6, 12-14.)  While the Chaplain does provide counseling and services to all inmates regardless of denomination, if so requested, the majority of faith-specific worship and study is conducted by volunteers, who donate their time to the institution pursuant to the FCJ Volunteer Policy. (See id. ¶¶ 15-16.)

There is no full-time Rabbi to service Jewish inmates, Apostle to service Mormon inmates, Preacher to service Protestant inmates, Monk, Lama, or Scholar to service Buddhist inmates of various sects, Brahmin to service Hindu inmates, or

Guru to service Sikh inmates.  (See id. ¶ 16.)  There is no full-time Shia Muslim cleric.  (See id.)  There is also no full-time cleric to service Eastern Rite Catholic inmates, Asatru inmates, Native American inmates of various tribes, Rastafarian inmates, Roman Catholic inmates, Eastern Orthodox inmates, or Wiccan inmates, despite the fact these religious denominations are or have previously been represented in the jail population.  (See id. at ¶¶ 16, 18.)

Presently, there is no volunteer Imam to provide religious services to Muslim inmates.  (See id. at ¶¶ 17, 19.)  Prior to October of 2005, the FCJ had an arrangement with an Imam referred to the institution by the Islamic Society of Western Maryland, who came as an unpaid volunteer to conduct Jumu'ah services once per month and lead prayer sessions during Ramadan.  (See id. at ¶¶ 20.)  At the end of the Ramadan holiday in 2006, after the Imam travelled to the FCJ and found no inmates wished to participate in services, he expressed no desire to return to the FCJ.  (See id. at ¶ 21.)  Franklin County Jail officials have and will continue to search for a volunteer Imam to provide religious services, but have been unable to locate one who will travel to the facility and perform services without compensation and/or reimbursement for travel expenses.  (See id. at ¶ 22.)

Especially given the lack of funds to provide reimbursement for volunteer expenses, the rural location of the facility has presented a significant obstacle in obtaining the services of a volunteer Imam.  (See id. at ¶¶ 23-23.)  Indeed, if

2

compensation and/or reimbursement of expenses were provided to volunteers, or if the jail were required to obtain full-time clergy for each sect represented therein, the FCJ would be unable to provide other vital educational and rehabilitative services to inmates, including GED classes and treatment programs.  (See id. at ¶ 23.)  The FCJ would also be required to reduce the number of correctional officers and staff, thus threatening institutional order and operations.  (See id.)

Muslim Inmates are accorded a space for their use in conducting self-led Taleem Studies each Thursday, Jumu'ah Services each Friday, special accommodations for use of the Chapel more frequently for religious holidays, and materials necessary for their worship and/or study, which is supervised by the Chaplain. (See id. at ¶¶ 17, 19, 24, 27, 37.)  Generally, all inmates are permitted to visit the Chapel for a formal religious service one (1) time per week, and a variety of groups utilize the space for informal religious activity according to schedules developed by the Chaplain which balance the access of all religious groups to the space.  (See id. at ¶ 13-14, 25-26.)  Inmates are additionally allowed to engage in individual prayer on a daily basis as they so desire, whether or not the facility is locked-down or organized programming has been cancelled. (See id. at ¶¶ 25-26, 31.)

Inmates are not permitted, however, to independently organize group prayer activities, as such must occur under supervision of the Chaplain, and cannot occur

in the living or recreational quarters of the facility, due to security and other concerns.  (See id. ¶¶ 32-33.)  Indeed, such can impede free movement by jail staff, interfere with recreational time provided to other inmates, or create disturbances.  (See id. at ¶ 33.)  Due to limited space and staff available to supervise religious programming, a request for additional Islamic classes in 2013 simply could not be accommodated.  (See id. at ¶ 25.)

The Chaplain, who has a good knowledge of and respect for Islamic doctrine and practice, is present to supervise inmate-led services, whether Islamic or otherwise, for security purposes.  (See id. at ¶ 28.)  Indeed, given the heightened emotional response present during religious services, there is a risk of physical violence either between inmates, or by inmates against staff, where matters of policy or administration which are in contest are discussed during time set aside for worship.  (See id. (citing Ex. "1", Affidavit of Daniel Keen ¶¶ 36-37).)  Where an inmate-leader strays from religious topics to discuss jail policy, practice or administration, the Chaplain for security reasons redirects the service back to religious worship.  (See SMF ¶ 28.)  Burkholder was required to repeatedly redirect services led by the Plaintiff, Vernon L. Ealy, Jr. [hereinafter "Plaintiff" or "Ealy"], as he used the time to criticize, question or express aspirations for change to jail policies, and to urge other inmates to make demands of the administration.  (See id. at ¶ 29.)  Aside from such redirection, Burkholder has not acted to halt or

disrupt Muslim services or the religious worship of any other inmate-led group which he supervises. (See id. at ¶¶ 29-30.)

Religious programming and activities, as other programming, may be disrupted due to security and/or operational needs within the facility, including but not limited to emergency head-counts, fights, medical emergencies, or due to short staffing. (See id. at ¶ 34.) On occasions where the Chaplain cannot be present to supervise Muslim religious programming, Weller inquires of male treatment officers, who are sometimes available to supervise in Burkholder's place. (See id. at ¶ 34 (citing Ex. "2", Affidavit of Michelle Weller, ¶ 63 (noting that a male supervisor is required pursuant to Islamic religious practice).) Programming is also disrupted during Call of the Criminal Trial List, which occurs in the facility every six (6) weeks, as a result of a jail-wide lock-down imposed while Court is in session in a Courtroom located inside the FCJ, for the protection of Judges, staff and litigants. (See id. at ¶ 35.)

The Franklin County Jail accommodates the various religious holidays and activities celebrated by the members of the inmate population as security and budgetary concerns will allow. (See id. at ¶ 36.) Indeed, it is the practice of the institution to grant religiously based requests where such are found valid and accommodation is at all possible. (See id. at ¶¶ 36, 75 (citing, for example Ex. "1", Affidavit of Daniel Keen, ¶ 30).) For the holiday of Ramadan, the Franklin

County Jail makes a variety of accommodations for the religious practice of Muslim inmates, including: early specially prepared breakfasts and late dinner meals, tendered according to the varying times of sunrise and sunset through the month, each with one-and-one-half the calorie content of regular meals; oranges previous to evening meal service for the breaking of the fast; an Eid Ul-Fitr feast held in the Chapel; liberal visits to the Chapel for the entire month, at least once daily, including the option to break the daily fast communally followed by group prayer in the chapel. (See id. at ¶ 37(a)-(i).)   Following the Ramadan fast, inmates are permitted to pray individually in their cells.  (See id. at ¶ 63.)   The meals provided during Ramadan, including that for the Eid Ul-Fitr feast, are the same as those tendered to the general population, according to various meal plans offered by the FCJ as elected by the particular inmate.  (See id. at ¶ 37(h).)

Special religious diets are provided by the FCJ, once validated, in accord with recommended daily allowances set by the National Academy of Science, consistent with the secure and orderly operation of the facility.  (See id. at ¶¶ 39-40.)  To this end, the FCJ provides general population inmates with a dietary plan which operates on a four (4) week cycle [hereinafter "General Population Meal Plan" or "General Plan"], comprised of both meat and vegetarian items, served by Trinity Services Group, Inc.  (See id. at ¶41-42.)  The General Population Meal Plan has been approved by a Licensed Dietician-Nutritionist, who has affirmed that

the meals provide a nutritionally adequate diet averaging 3000 calories per day, as required for adult males.  (See id. at ¶ 42.)  Each meal prepared costs $1.18 per tray.  (See id.)  Likewise, the jail offers a Vegetarian and a Vegan Meal Plan [hereinafter "Vegetarian and/or Vegan Plan"], which also comports with recommended daily allowances, at the same cost per tray as the General Plan.  (See id. at ¶ 45-46.)

The General Population Meal Plan does not contain pork, pork by-products, or pork derivatives, and contains no blood, carnivorous animals, reptiles, or insects, and no alcohol.  (See id. at ¶ 44.)  The ingredients comport with guidelines for a Muslim religious diet as set forth by the United States Department of Justice, and the provider and kitchen staff have assured Moving Defendants the menu is compliant with Islamic dietary restrictions.  (See id. at ¶¶ 38, 44, 53, 60.)  Islamic law specifies that foods are either *halāl*, lawful, or *harām*, forbidden, and that all foods are halāl unless expressly forbidden.  (See id. at ¶ 38.)   In such case as a Muslim inmate is concerned the General Plan does not comport with Islamic law, the Vegetarian and/or Vegan Plans provide additional options, containing ingredients that are, without doubt, halāl.  (See id. at ¶¶ 45-46.)   All requests for the Vegetarian and/or Vegan Plans are granted immediately regardless of the reason therefore.  (See id; Ex. "2" Affidavit of Michelle Weller ¶ 12, 19.)

The FCJ meal plans were chosen with deliberation and consideration of the most cost effective and efficient means to provide for the dietary needs of the broadest possible segment of the inmate population using a single meal plan.  (See id. at ¶ 43.)  The Plans omit pork and pork by-products, so that no special meals are required for inmates whose religious dietary rules prohibit consumption of pork, a common prescription in many religions. (See id. at ¶¶ 43-44, 47.)   The Plans simplify food preparation by reducing ingredients, and increase efficiency and security, using only three (3) full-time and one (1) part-time kitchen staff. (See id. at ¶¶ 47-50.)

Kitchen staff can easily accommodate a switch to the Vegetarian Plan without obtaining additional ingredients or costly alternative foodstuffs separately from outside the FCJ, which would create security concerns and require the hiring of more correctional officers. (See id. at ¶¶ 43, 47-50.)   The dietary needs of inmates of all religious denominations, with the exception of Jewish inmates observing kosher law, are satisfied by the General and/or Vegan/Vegetarian Plans. (See id. at ¶¶ 44, 51-53, 60.)  Kosher food, because of the intricacies involved in its preparation and service, simply could not be prepared inside the facility absent prohibitive cost, including but not limited to that involved in creating and maintaining separate kitchen facilities suitable to prepare such.  (See id. at ¶ 52.)

A "Halāl Menu" would remove many of the benefits now provided by the General and Vegetarian Plans, complicating food service, requiring more deliveries, and additional kitchen staff.   (See id. at ¶ 55.)   Equal protection considerations would require creation of, for example, a "Buddhist Menu," "Sikh Menu," and specific plans for the other denominations represented in the facility. (See id. at ¶ 56.)  To offset the enormous costs, the jail would be required to reduce the number of correctional officers employed, as well as reduce the rehabilitative and educational services provided to inmates, thereby affecting the institutional order, and the safety and security of remaining staff and the inmate population. (See id. at ¶¶ 55-58.)  To provide specifically and separate halāl meat, the facility would need greater numbers of correctional officers to check more frequent food deliveries, but the costs of the meats themselves and added labor such would create would require a reduction in correctional staff.  (See id. at ¶ 58.)

After Ealy's requests regarding the 2013 Eid Ul-Fitr Feast, Weller confirmed with an Imam that no special items were needed, and was additionally assured the feast need not be prepared by Muslim individuals to qualify as halāl.  (See id. at ¶¶ 54, 60.)  The early breakfasts served during the month of Ramadan are prepared the night before, due to staffing and budgetary concerns, reducing the necessity for payment of overtime to kitchen staff, and to correctional officers, in the early morning hours.  (See id. ¶ 59.)  While every effort is made to timely deliver meals

to Muslim inmates during the month of Ramadan, according to the variable times of sunrise and sunset, security needs may delay food service and provision of the oranges for breaking the fast for short periods.  (See id. at ¶¶ 37(b)-(d), 61-62.) During the 2013 Ramandan holiday, food service was delayed at most forty-five (45) minutes, but generally delayed less than five (5) minutes.  (See id. at ¶ 61.)  A request made by Ealy that Muslim inmates be permitted to pray and break the fast communally each night in the chapel, afterward returning to their living quarters for special meals, was granted, but caused further delays in meal service given the necessity for escort of each participating inmate to the chapel from their cells, and back following prayer.  (See id. ¶ 62.)

The FCJ makes substantial efforts to accommodate requests for religious materials, as security and budgetary concerns allow.  (See id. at ¶ 36.)  Indeed, after Plaintiff requested Muslim inmates be permitted to possess and use prayer oils, accommodation was made to allow for such, taking into account security concerns associated therewith.  (See id. at ¶¶ 64-65.)  A request for prayer rugs was also accommodated, also accounting for security issues which could arise from their use.  (See id. at ¶ 66.)

Previous to Ealy's incarceration, the FCJ Chapel had a small collection of religious manuscripts of various denominations for use by inmates, either in the Chapel itself, or for check-out for study in their cells.  (See id. at ¶¶ 67-69, 71.)

The Holy Qur'an, as well as other preeminent texts for various faiths, may be purchased in the Commissary, and if an inmate is indigent, the facility will purchase for the individual the appropriate religious manuscript for their particular denomination. (See id. ¶ 67.)  Upon Ealy's request additional Islamic materials be purchased for use in the FCJ Chapel, Weller responded by attempting to locate materials, corresponding with Ealy about the search and results, and obtaining such of the requested texts as could be found and were deemed suitable for review by the inmate population.  (See id. at ¶¶ 69-74.)   As to the Nobel Qur'an, investigation into Plaintiff's request that it be provided to inmates and sold in the Commissary occurred, and the volume was determined to be too radical to be given to the inmate population, the currently available edition additionally having been approved by a nationally recognized Islamic organization.  (See id. at ¶¶72-74.)

Inmates are required to sleep on their assigned bunk within their assigned cell, absent a valid reason alternate arrangements are necessary, due to security and safety concerns, as well as due to requirements set by Pennsylvania law.  (See id. at ¶¶ 76-77.)  In the case an inmate desires alternate sleeping accommodations, they may submit a request slip that will be evaluated and granted if merited.  (See id. at ¶ 76.)  Following Plaintiff's Requests and Grievances, the medical reason for his request for alternate arrangements was evaluated by prison medical providers,

who assured Moving Defendants no medical reason required Ealy to sleep on the floor.  (See id. at ¶¶ 78-79.)


## II.    Procedural History

On November 14, 2013, Plaintiff, Vernon L. Ealy, a Sunni Muslim inmate, initiated this action with the filing of a *pro se* civil rights Complaint pursuant to 42 U.S.C. Section 1983, alleging violation of his constitutional rights, and making additional claims pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* On March 13, 2014, Moving Defendants waived service of the Summons and the Complaint.  Plaintiff's religiously based claims can be loosely grouped into four (4) categories: (1) relating to lack of a full-time Sunni Muslim Imam to provide religious services to Islamic inmates, and the FCJ volunteer clergy policy; (2) regarding the facility's restriction on inmate congregational prayer and lack of additional activity time, supervision of inmate-led services by the prison Chaplain, and cancellation or delay of religious programming;  (3) regarding the content of meals provided to Muslim inmates, both on holidays and possibly otherwise, the timing of Ramadan meals and sufficiency of Ramadan accommodations; and (4) as to the facility's collection and/or regulation of the use of Islamic materials.

As to each factual category, Ealy alleges a violation of his rights under the Free Exercise Clause and Establishment Clause of the First Amendment, as well as pursuant to the RLUIPA.  Ealy additionally alleges the failure to provide a full-time Sunni Muslim Imam violates the Equal Protection Clause of the Fourteenth Amendment, as does restrictions on congregational prayer and provision of Islamic materials. Finally, Ealy makes a claim under the Eighth Amendment, relating to the refusal of FCJ employees and administrators to allow him to sleep on the floor of his cell.  The Motion to Dismiss and/or for Summary Judgment filed on April 28, 2014, submitted in response to the Complaint, requests dismissal with prejudice and/or entry of judgment in favor of Defendants and against Plaintiff as to all claims asserted against each.  This Brief is tendered in support thereof.

### III.   Questions Presented

**A.   Because Plaintiff has Failed to Allege Personal Involvement by Defendants Rouzer, Sterner-Lensbower and Sullen in Any Alleged Violation, Must the Claims Against them be Dismissed?**

**B.   Must Plaintiff's Claims for Declaratory or Injunctive Relief under Section 1983 Be Dismissed Given his Transfer from the FCJ?**

**C.   Must Plaintiff's RLUIPA Claims be Dismissed as a Matter of Law, and/or Should Judgment be Entered in Favor of Defendants and Against Plaintiff Thereupon?**

**D.   Has the Plaintiff Failed to Allege a Claim under the First Amendment Free Exercise Clause, and/or Should Judgment be Entered in Favor of Defendants?**

    **E.**     **Has Plaintiff Failed to Make Any Viable Section 1983 Claims Under the Establishment Clause, and/or are Defendants Entitled to Judgment in their Favor?**

    **F.**     **Must any Claim Under the Equal Protection Clause of the Fourteenth Amendment be Dismissed and/or Judgment Entered in Favor of Defendants?**

    **G.**     **Has Plaintiff Failed to State an Eighth Amendment Claim?**

    **H.**     **Are Defendants Entitled to Qualified Immunity?**

         **[Suggested Answers in the Affirmative]**

**IV.**  **<u>Standard of Review</u>**

    **A.**     **Motion to Dismiss**

A Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the Complaint.  <u>See</u> <u>Sturm v. Clark</u>, 835 F.2d 1009, 1011 (3d Cir. 1987).  To survive a Motion to Dismiss, the Complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*quoting* <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Indeed, the Federal Rules of Civil Procedure mandate dismissal of Complaints which, as a matter of law, fail to state a claim upon which relief can be granted.  <u>See</u> Fed. R. Civ. P. 12(b)(6).  A

plaintiff must "nudge[] their claim across the line from conceivable to plausible" or "their complaint must be dismissed." Twombly, 550 U.S. at 570.

When ruling upon a Rule 12(b)(6) Motion to Dismiss, the Court must accept the factual allegations contained in the Complaint, and all reasonable inferences that can be drawn therefrom, as true. See Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). However, the Court may disregard "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." Iqbal, 556 U.S. at 678-79. A plaintiff must provide the grounds for his entitlement to relief as a matter of law, or the Complaint must be dismissed. See Twombly, 550 U.S. at 570. In Bistrian, the Third Circuit described "plausibility", the "touchstone" of the pleading standard, as existing where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012) (quoting Iqbal, 556 U.S. at 678). Facts "merely consistent" with liability do not satisfy this standard. Id.

In ruling on a Motion to Dismiss, the Court may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complaint's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not

alleged." <u>Associated Gen. Contractors of Cal. v. California State Council of Carpenters</u>, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).

### B.   Motion for Summary Judgment

Summary Judgment is proper where there are no genuine issues of dispute as to any material fact, and the movant is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). Indeed, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248.

The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matshushita Electrical Industrial Company v. Zenith Radio Corp.</u>, 475 U.S. 574, 106 S. Ct. 1348, 1386, 89 L. Ed. 2d 538 (1986). Rather, a party must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U .S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); <u>Harter v. G.A.F. Corp.</u>,

16

967 F.2d 846, 851 (3d Cir. 1992).   Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion.   See Garraway v. Lappin, No. 4:CV-10-1697, 2012 U.S. Dist. LEXIS 38712, *7-8 (M.D. Pa. March 21, 2012).

If the non-movant bears the burden of persuasion at trial, the moving party may meet its burden by showing that the evidentiary materials of record, if reduced to admissible form, would be insufficient to carry the non-movant's burden at trial. See Chippollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987), *cert. dismissed*, 483 U.S. 1052 (1987).   Motions for Summary Judgment that are presented to the court as motions in the alternative constitute sufficient notice to a non-moving party that the court may convert a Motion to Dismiss into a Motion for Summary Judgment.   See Hilfirty v. Shipman, 91 F.3d 573, 578-79 (3d Cir. 1996).

## V.   <u>Argument</u>

### A.   **Plaintiff Has Failed to Allege Personal Involvement by Defendants Rouzer, Sterner-Lensbower and Sullen, and All Claims Against them Must be Dismissed**

"Individual" capacity suits under 42 U.S.C. § 1983 seek to impose personal liability upon a government official for actions taken under color of state law.   See Kentucky v. Graham, 473 U.S. 159, 165, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).

To establish personal liability against a defendant in a Section 1983 action, that defendant must have played an affirmative role, or have had personal involvement, in the alleged wrongs.  See Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  In cases of a supervisory or reviewing defendant, personal involvement may be shown by allegations of "personal direction or of actual knowledge and acquiescence."  Rode, 845 F.2d at 1207.

Plaintiff has not sufficiently alleged the personal involvement of Defendants Rouzer, Sterner-Lensbower or Sullen.  The sole allegations against Sterner-Lensbower and Rouzer relate to their actions in denying Plaintiff's inmate grievances.  The sole allegation as to Defendant Sullen is that, along with Defendant Keen, he affirmed to correctional officers that inmates are not allowed to pray in the recreational yard and that Ealy was required to sleep on his assigned bunk.

Again and again, Courts in this Circuit have held that "the denial of a grievance or mere concurrence in an administrative appeal process is insufficient to establish personal involvement."  See Riley v. DeCarlo, No. 11-537, 2012 U.S. Dist. LEXIS 137279, *10-11 (W.D. Pa. 2012), aff'd, 2013 U.S. App. LEXIS 2969 (3d Cir. 2013) (citing Jefferson v. Wolfe, No. 04-44, 2006 U.S. Dist. LEXIS

46748, *17 (W.D. Pa. July 11, 2006); <u>Watkins v. Horn</u>, No. CIV.A. 96-4129, 1997

U.S. Dist. LEXIS 13844, *4 (E.D. Pa. Sept. 5, 1997); <u>Garraway</u>, 2012 U.S. Dist.

LEXIS 38712, at *67-69; <u>Pressley v. Beard</u>, 266 Fed. Appx. 216, 218 (3d Cir.

2008)).   In <u>Pressley</u>, the Third Circuit found the District Court properly dismissed

defendants who were sued solely "based on their failure to take corrective action

when grievances or investigations were referred to them."   <u>Pressley</u>, 266 Fed.

Appx. at 218.   Here, like in <u>Riley</u> and <u>Pressley</u>, the sole allegation relating to the

involvement of Sterner-Lensbower, Rouzer and Sullen are that they denied

Plaintiff's grievances, which were then referred on appeal up the FCJ chain of

supervision.   Such is simply insufficient to allow liability under Section 1983, and

requires dismissal of Plaintiff's claims against them.


### B.      Plaintiff's Claims for Declaratory or Injunctive Relief under Section 1983 and the RLUIPA Must Be Dismissed

It is well settled that "[a]n inmate's transfer from the facility complained of

generally moots . . .  equitable and declaratory claims." <u>Sutton v. Rasheed</u>, 323

F.3d 236, 248 (3d Cir. 2003).   <u>See also</u> <u>Pruden v. Schuylkill Cnty Prison Med.</u>

<u>Staff</u>, No. 3:CV-07-006, 2007 U.S. Dist. LEXIS 12353, *1 (M.D. Pa. Feb. 6, 2007)

(A. Richard Caputo, J.).   The mootness doctrine recognizes a fundamental truth in

litigation: "[i]f developments occur during the course of adjudication that eliminate

a plaintiff's personal stake in the outcome of a suit or prevent a court from being

able to grant the requested relief, the case must be dismissed as moot." Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 698-99 (3d Cir. 1996).   The mootness doctrine applies both to claims asserted under Section 1983, as well as those injunctive and declaratory claims asserted under the RLUIPA.  See, e.g., Banks v. Beard, No. 3:CV-10-1480, 2013 U.S. Dist. LEXIS 140629, *21-22 (M.D. Pa. Sept. 30, 2013) (citing Abdul-Akbar v. Watson, 4 F.3d 195, 197 (3d Cir. 1993)).

Plaintiff has been transferred from the FCJ as of April, 2014.  (See Doc. 18, Notice of Change of Address.)  Thus, even if his claims had merit, which is denied, there is no evidence of any possibility he will be disadvantaged "in the same fundamental way" in the future.  Sutton, 323 F.3d at 248.  Where an inmate seeks injunctive relief against his jailers, but is no longer housed at the institution where the claims arose, the request for an injunction is "academic," and therefore subject to dismissal for mootness.  Fortes v. Harding, 19 F. Supp. 2d 323, 326 (M.D. Pa. 1998) (Vanaskie, J.).  Thus, Plaintiff's transfer from the FCJ renders moot and subject to dismissal his injunctive and declaratory claims under both the RLUIPA and Section 1983.

    **C.**    **Plaintiff's RLUIPA Claims for Damages Must be Dismissed as a Matter of Law and/or Judgment Entered in Favor of Defendants**

        **1.**    **Governmental Immunity Bars RLUIPA Claims for Money Damages, and Such Must be Dismissed**

Plaintiff makes claims under RLUIPA for monetary damages against Defendants in their individual and official capacities, as well as the claims for injunctive and declaratory relief discussed *supra*.  First, any claims for money damages against Defendants in their individual capacities under the RLUIPA must fail as a matter of law, given the Third Circuit's determination in <u>Sharp v. Johnson</u>, 669 F.3d 144 (3d Cir. 2012).  In <u>Sharp</u>, the Court concluded, in a matter of first impression, that the RLUIPA does not permit actions against State officials in their individual capacities.  <u>See</u> <u>id.</u> at 153.

Enacted under the spending powers of Congress pursuant to Article I of the Constitution, RLUIPA subjects State recipients of federal funding to liability in private causes of action as a condition of receipt.  <u>See</u> <u>id.</u> at 154.  Such power cannot be used, however, to subject an individual state employee to liability in a private cause of action, as they are not parties to the contract created between the State and the Federal government.  <u>See</u> <u>id.</u>  at 154-55.  <u>See also, e.g.</u>, <u>Rendelman v. Rouse</u>, 569 F.3d 182 (4th Cir. 2009).  <u>See also</u> <u>Heim v. Moore</u>, No. 11-0270, 2012 U.S. Dist. LEXIS 46786, *3 (M.D. Pa. April 3, 2012)

Similarly, claims against the Defendants for money damages in their official capacities are not cognizable under RLUIPA.  <u>See, e.g.</u>, <u>Heim</u>, 2012 U.S. Dist. LEXIS 46786, at *8-9; <u>Banks v. Beard</u>, No. 3:CV-10-1480, 2013 U.S. Dist. LEXIS

140629, *21-22 (M.D. Pa. September 30, 2013) (James M. Munley, J.).  As this

Honorable Court pointed out in <u>Banks</u>:

> The Eleventh Amendment bars money damages sought
> against a state official acting in his or her official
> capacity absent a valid abrogation by Congress or
> consent of the State. Congress did not validly abrogate or
> purport to abrogate the States' sovereign immunity
> against damages claims under RLUIPA, and the
> Commonwealth of Pennsylvania has not waived its
> Eleventh Amendment immunity.

<u>Id.</u> at *22.

Indeed, the RLUIPA creates a private right of action for declaratory or

injunctive relief, but the federal courts have uniformly held the Act does not allow

for grant of monetary damages.  <u>See</u>, <u>e.g.</u>, <u>Heim</u>, 2012 U.S. Dist. LEXIS 46786, at

*8; <u>Cohen v. Wagner</u>, No. 13-cv-674, 2014 U.S. Dist. LEXIS 6426, *15 n. 4 (E.D.

Pa. January 16, 2014) (holding no claim for monetary damages could be asserted

under the RLUIPA against Berks County Jail officials in either their official or

individual capacities). <u>See also</u> <u>Sossamon v. Texas</u>, 560 F.3d 316 (5th Cir. 2009),

*aff'd*, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (2011) (addressing official capacity

claims and holding that Section 3 of RLUIPA does not allow an individual to sue a

state or a state official in his official capacity for monetary damages).  Thus,

Plaintiff's RLUIPA claims for monetary damages are simply not cognizable, and

should be dismissed as a matter of law.

### 2.    Even Were a Claim Stated Under RLUIPA, Defendants Are Entitled to Judgment in their Favor Thereupon

Even if a cause of action could be brought against Moving Defendants for damages or equitable relief under RLUIPA as a matter of law, which is denied, judgment is clearly merited in their favor and against Plaintiff.  Indeed, to prevail in a cause of action under the RLUIPA, an inmate must show a substantial burden is imposed on their religious practice.  A substantial burden exists where "(1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify his behavior to violate his beliefs." Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007).

If an inmate satisfies his initial burden of showing that a practice substantially burdens his religious exercise, the burden then shifts to the government to show that the challenged policy "is in furtherance of a compelling governmental interest and is the least restrictive means" to enforce that interest. Id. at 283.  Here the facts unequivocally show Plaintiff cannot, as a matter of law, satisfy his initial task of demonstrating any policy substantially burdens his religious exercise.  There is literally no allegation in the Complaint of any policy which caused a substantial modification to Ealy's behavior in such a way as to

violate his beliefs.   There is no allegation that Ealy was required to violate his beliefs to receive any benefit otherwise generally available.   Rather, the FCJ accommodates the free exercise of Islamic religious practice, requiring modifications that in no way violate, cause abandonment, or demand Plaintiff substantially alter, any religious belief.

Moreover, even Plaintiff could show a substantial burden, which the facts clearly show he cannot, the interests cited by Defendants in support of the policies at issue, including security, safety, and operational concerns, are compelling, and each accommodation is the least restrictive means to enforce such.   Thus, Plaintiff has asserted no cognizable claims under the RLUIPA, and any claims under the statute must be dismissed with prejudice, and/or judgment entered against Ealy and in favor of Defendants.

    **D.**    **Plaintiff Has Failed to Allege a Claim under the First Amendment Free Exercise Clause, and/or Judgment be Entered in Favor of Defendants Thereupon**

In accord with the directive of the First Amendment that government refrain from interference with the free exercise of religious belief, the Supreme Court has held that prisoners must be afforded "reasonable opportunities" to exercise the religious freedom guaranteed under the Constitution.   Cruz v. Beto, 405 U.S. 319, 322 n.2, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972); O'Lone v. Estate of Shabazz, 482

U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987) (citation omitted). Nonetheless, the Supreme Court has repeatedly recognized that "subjecting the day-to-day judgments of prison officials to a strict scrutiny analysis would impede the officials' ability to anticipate and solve security and administrative problems." Sharp v. Johnson, 669 F.3d 144, 155(3d Cir. 2012) (*citing* Turner v. Safley, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)).

As a result of this concern, "the Court found that when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. To determine whether a regulation infringing upon constitutional rights is reasonable, a four (4) factor test is employed, first set forth by the United States Supreme Court in Turner, and described by the Third Circuit Court of Appeals as follows:

> (1) [T]here must be a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest put forward to justify it . . . (2) whether the inmate has alternative means of exercising the right at issue; (3) the burden that the accommodation would impose on prison resources; and (4) whether any ready alternatives to the regulation exist that would fully accommodate the inmate's rights at *de minimis* cost to valid penological objectives . . . After *Turner*, we developed a two-step analysis for determining whether a prison's regulation is reasonably related to a penological interest. First, the prison has the burden of demonstrating the First *Turner* Factor. This burden is slight, and in certain instances, the connection may be a matter of common sense. Second, if the prison meets its burden

under the First *Turner* Factor, then we consider the Other
*Turner* Factors.

Sharp, 669 F.3d at 155-56.

In light of this test, the Third Circuit has interpreted the Supreme Court's

decision in Overton v. Bazzetta, 539 U.S. 126, 123 S. Ct. 2162, 156 L. Ed. 2d 162

(2003), as placing the "ultimate burden of persuasion with regard to the

reasonableness of a regulation" on the inmate.    Sharp, 669 F.3d at 156.

Nonetheless, the prison must "put forward the legitimate governmental interest

alleged to justify the regulation and demonstrate that the policy drafters could

rationally have seen a connection between the policy and [that interest]." Id. at 156

(citations omitted).  Moreover, the Supreme Court has admonished that "a prison's

internal security is peculiarly a  matter normally left to the discretion of prison

administrators." Rhodes v. Chapman, 452 U.S. 337, 349 n.14, 69 L. Ed. 2d 59,

101 S. Ct. 2392 (1981).

**1.    Failure to Employ a Full-Time Imam, and the FCJ
Religious Services Policy, Do Not Violate the First
Amendment Free Exercise Clause**

First, given the religious make-up of the inmate population and budgetary

concerns, the failure to employ a full-time Sunni Muslim Imam, and FCJ policies

on provision of religious services, are without doubt reasonably related to

legitimate penological interests.  The Supreme Court has made clear that "[a]

special chapel or place of worship need not be provided for every faith regardless

of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." <u>Cruz</u>, 405 U.S. at 322 n. 2.  The Third Circuit echoed this sentiment in <u>Gittlemacker</u>, stating "[t]he requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice." <u>Gittlemacker v. Prasse</u>, 428 F.2d 1, 4 (3d Cir. 1970).

Procurement of a cleric reflective of the majority of the inmate population, where budgetary concerns constrain the ability of a facility to obtain multiple clergy, has repeatedly been found reasonable and rationally related to legitimate interests. <u>See</u>, <u>e.g.</u>, <u>Smith v. Kyler</u>, 295 F. App'x 479, 481 (3d Cir. 2008) (no violation of the Free Exercise Clause occurred by reason of a DOC policy "to provide Chaplains for only the largest major faith groups and to prohibit group worship in the absence of an approved, volunteer Faith Group Leader" given legitimate interests including managing limited financial resources and maintaining prison security).  Currently, there are only six (6) inmates who self-describe as Muslim housed in the FCJ, none of which specifically state they are Sunni.  (<u>See</u> SMF ¶ 18.)  The majority of inmates describe themselves as "Christian" without further specification.  (<u>See</u> <u>id.</u>)

Employment of a single, Christian Chaplain, therefore, provides for the majority of the inmates at the jail, consistent with budgetary limitations.  (See id. at ¶ 23.)  If a Sunni cleric was obtained, there is no reason why a Shia cleric should not also be procured, or a Buddhist cleric, or an Asatru cleric, or a Wiccan clergymember.  Such would devastate the operational budget of the facility, requiring reductions in vital security and treatment staff and services, placing inmates and staff into jeopardy.  In Garraway, the Court summarized precedent on the issue, stating:

> The Free Exercise Clause guarantees substantive right but does not guarantee that all religious sects will be treated alike in all respects. While prisoners must be given reasonable opportunity to exercise their faith, the Constitution does not require that a religious adviser be provided to cater to every sect/sub-sect in the penitentiary, nor does the Constitution require that prisoners be provided with a religious adviser of their choice or with the one belonging to their unique religious sect/sub-sect (or sharing their unique religious views).

Garraway v. Lappin, No. 4:cv-10-1697,  2012 U.S. Dist. LEXIS 38712, *33-34 (M.D. Pa. March 21, 2012) (citing, among others omitted, Allen v. Toombs, 827 F.2d 563, 569 (9th Cir. 1987) (a prisoner is not entitled to have the clergyman of his choice provided for him in the prison)).

The FCJ Volunteer Policy is likewise rationally related to the same legitimate government interests.  Given budgetary limitations, providing religious services for inmates who do not view the Chaplain as a proper authority using

volunteers particular to their faith group is rational, as is the failure of the facility to reimburse for expenses.  The inability to locate a volunteer Imam willing to provide services to Muslim inmates in the FCJ cannot state a constitutional claim, especially given the extensive and ongoing efforts to find such an individual.  Cf. Shepard v. Peryam, 657 F. Supp. 2d 1331, 1347-48 (S.D. Fl. August 20, 2009) (finding policy to use volunteer clergy to provide religious services constitutional, and no violation where no Islamic volunteer available given allowance of individual prayer and group informal discussions).  Plaintiff has not and cannot plead a volunteer is waiting to provide services and Defendants have refused same.  As in Garraway, Defendants submissions herein clearly show that when Muslim volunteers were available, they were utilized, and that there have been and continue to be ongoing efforts to locate further volunteer Imams.  (See SMF ¶¶ 22-23.)

Alternatives for exercise of the right are provided.  In rejecting a similar claim in Holman, the Court noted that the Plaintiff did not complain he was not allowed to associate with other Muslims, given religious texts or items associated with his religion, or allowed time for group prayer.  See Holman v. Hogue, No. 11-1269, 2013 U.S. Dist. LEXIS 42770, *12 (W.D. Pa. February 15, 2013).  Likewise, Islamic inmates in the FCJ are afforded opportunity for both weekly group worship and weekly religious study, can pray individually, are afforded the

use of religious items including prayer oil and rugs, and offered accommodations for religious holidays. (See SMF ¶¶ 24, 31, 37, 63-67, 71.)

Finally, the accommodations requested or intimated by Plaintiff are not *de minimis*, but instead would threaten security and institutional order. Payment to a volunteer Imam for services and/or travel time and expenses could not be accommodated by the FCJ given budgetary constraints, and if required would severely strain facility financial resources. (See id. at ¶ 23.) Additionally, if the jail were to compensate a Sunni Muslim Imam volunteer for travel or expenses, Equal Protection considerations would require payment to a Shia Muslim volunteer, a Rabbi, a Brahman, and/or a Guru upon request. The costs of such engagements would seriously hamper the ability of the FCJ to provide rehabilitative services to inmates, and likely result in the layoff of correctional officers and other staff, compromising security and good operational order. (See id. at ¶ 23.)

Weighing similar concerns in Holman, the Court stated:

> It is not the responsibility of the prison to provide Plaintiff with access to every religious accommodation he requests. Nor is it the responsibility of a county jail with limited resources to provide services for every faith of every prisoner in its facility. Budgetary constraints constitute a valid penological interest and restricting religious-based services has been held to be rationally related to that interest.

Holman, 2013 U.S. Dist. LEXIS 42770, at *12.  Clearly, based on the undisputed evidence of record, Defendants are entitled to judgment in their favor, and against the Plaintiff, on all claims under the Free Exercise Clause regarding lack of a full-time Imam and the provision of religious services by the FCJ.

> **2.     Restrictions on Communal Prayer, Use of the Chapel, Supervision of Services and Necessary Cancellations or Delays to Religious Programming Do Not Violate the First Amendment Free Exercise Clause**

Plaintiff similarly fails to state any claim, and/or Defendants are entitled to judgment as a matter of law, regarding regulation and supervision of communal prayer inside the FCJ and the use of the jail chapel.  Inmates confined in the FCJ are not permitted to themselves organize group worship, and are not permitted to conduct such group worship at any time, in any place, in any manner they may wish.  (See id. at ¶¶ 32-33.)  Rather, religious programming is organized and supervised by the Chaplain, given security concerns and to avoid perceived unfairness or interference with the recreation or beliefs of other inmates, and must occur in the chapel.  (See id. at ¶¶ 6, 12-14.)

The regulation is clearly related to legitimate governmental interests of equality and security.  Allowing inmates to independently organize group prayer in living quarters or recreational spaces within the facility could impede free movement of correctional staff compromising security, or interfere with activities

of other inmates outside the faith group.  (See id. at ¶¶ 32-33.)   Non-Muslim

inmates could become offended themselves, or offend the practitioners, thereby

creating disturbances and even precipitating physical altercations.   (See id.)

Avoiding such difficulties is clearly related to legitimate penological interests.

     Likewise supervision of inmate-led services by the Chaplain is without

doubt related to a legitimate penological interest: security.  Without anyone present

to redirect services which stray to discuss operational or administrative matters,

and to monitor discussions, disagreements could arise that might even lead to

violence between inmates or against staff.  (See id. at ¶ 28.)  Inmates who are

present but did not participate could be unjustly disciplined.  (See id.)  The

Chaplain's presence does not interfere with religious worship, but rather simply

ensures that time set aside for such in the chapel is used as intended.

     The accommodations requested would substantially burden the facility.

Allowing inmate organized group worship in living or recreational quarters would

compromise security, as would allowance of unsupervised inmate-led services in

the chapel.  Moreover, affording Islamic inmates time in the chapel additional to

the formal group worship once a week, and informal study once a week, already

provided, could create a perception of unfairness and favoritism.  Review of the

Chapel schedules, and the various duties performed by the Chaplain, demonstrate

that religious practice within the facility is frequent, and that the space and time for

such is limited, as are supervisors therefore.  (See id. at ¶¶ 6, 14; Ex. "3B", FCJ Chapel Schedules.)  Further Islamic activities simply could not be accommodated without the time and attention given to other groups suffering, and unfairly constricting the ability of other religious denominations to exercise their right to religious practice.  Cf. Garraway, 2012 U.S. Dist. LEXIS 38712, *26-29 (noting chapel schedules balance diverse needs of inmate population, and accommodation of one group's desire to monopolize chapel resources poses security risk).

Alternative means are clearly available, and no further accommodations could be provided at de minimis cost.  Case law is clear that there is no freestanding right to attendance at communal services.  See also Palmer v. Rustin, Civil No. 10-0042, 2011 U.S. Dist. LEXIS 65678, 2011 WL 2489820, at *9 (W.D. Pa. June 21, 2011) (dismissing claim based on denial of right to attend Muslim services); Gould v. Beard, Civil No. 07-0055, 2010 U.S. Dist. LEXIS 18883, 2010 WL 845566, at *6 (W.D. Pa. Jan. 16, 2010) (holding prisoner did not have right to communal Nation of Islam services); Morris—El v. Menei, Civil No. 00-200J, 2006 U.S. Dist. LEXIS 32095, 2006 WL 1455592, at *2-6 (W.D. Pa. May 22, 2006) (denying claim failure to provide Moorish Science services violated right to Free Exercise).  Nonetheless, the FCJ provides Islamic inmates the opportunity to participate in inmate-led Taleem studies each Thursday, and in Jumu'ah services

each Friday, communally in the jail Chapel.   (See SMF ¶¶ 14, 17, 19, 24-26.) Inmates may also engage in daily individual prayer if they so desire.   (See id. at ¶¶ 25-26, 31.)

Supervision by the Chaplain of group worship does not diminish such opportunities for communal prayer, and clearly given the aforementioned security concerns, accommodation by allowing unsupervised inmate-led services is not *de minimis*.   Burkholder, who has an extensive knowledge and deep respect for religious practice, and considers himself akin to Islamic practitioners, does not guide, direct or disrupt Islamic group-worship, but rather simply supervises due to security concerns.   (See SMF ¶ 24, 27-28, 30.)   Pogue v. Woodford, No. CIV 5-05-1873, 2009 U.S. Dist. LEXIS 75943, *8 (E.D. Cal. August 25, 2009) (only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are violated).   Indeed, no action by Burkholder as pled in the Complaint, even if true, is sufficient to infringe upon any right to religious worship.   Rather, Ealy alleges only that Burkholder "ruffled papers," coughed or made other soft noises, and redirected sermons which departed from religious topics.   (See Doc. 1, Compl. ¶ 15.)

In Garraway, it was similarly argued that the failure to allow congregational prayer in the recreational yard was a violation of First Amendment rights.   See

Garraway, 2012 U.S. Dist. LEXIS 38712, *29-32.  Officials cited security concerns as the rationale for such prohibitions, which applied equally to all inmates irrespective of religious denomination.  See id. at *29-30.  By offering Muslim study groups and weekly services, the facility was deemed to offer sufficient alternative means for worship.  See id.  Cf. Smith, 295 Fed. App'x at 483-84 (determining an inmate's Free Exercise rights were not violated by a DOC policy prohibiting group worship in the absence of an approved faith group leader).  So, too, individual prayer in the inmate's particular cell is another alternative means for exercise outside the supervision of the Chaplain.

Any cancellations or delays in religious programming, both as pled and demonstrated by Defendants' submissions herein, are reasonably related to legitimate penological interests, and should be dismissed and/or judgment entered against Plaintiff and in favor of Defendants.  Policies relating to delays or cancellations are clearly related to legitimate interests.  All programming within the facility, not just that religious in nature, is subject to operational and security needs.  There is no doubt that proper handling of emergency headcounts, fights, medical emergencies, and short staffing are legitimate interests, and that in order to maintain good order within the institution, such security and operational needs may require cancellations or delays.  Moreover, lock-downs imposed by reason of Call of the Criminal Trial List, in a Courtroom conveniently located within the facility,

for the safety of the Court, it's staff, and the litigants involved, is without doubt rationally related to security, a legitimate interest.

Programs continue as scheduled absent such pressing needs, providing alternative means to exercise the rights at issue.  Moreover, the FCJ Inmate Handbook specifically suggests using lock-down time for individual prayer, and nothing prevents an inmate from doing so, also providing an alternative for exercise.  (See SMF ¶ 31; Ex. "9", FCJ Inmate Handbook ¶ 27.)  There is no less restrictive means of ensuring the safety and security of the institution during emergencies, in cases where staffing concerns arise within the facility, and while Court is in session, than delaying or cancelling religious or other programming. The relief requested is not *de minimis*, rather, to continue holding programs in the midst of a medical emergency, fight, or with short staffing would severely burden jail operations and compromise security.  Defendants are clearly entitled to dismissal, and/or to judgment in their favor and against the Plaintiff, as to any claims relating to congregational prayer and use of the chapel, supervision of inmate-led worship, and delay or cancellation of programming.

### 3.    Failure to Provide a "Halāl Menu," Halāl Meat, and/or the Eid Ul-Fitr Feast and Ramadan Accommodations Do Not Violate the First Amendment Free Exercise Clause

Nor does Ealy make any cognizable claim, and/or Defendants are entitled to judgment as a matter of law, with regard to the lack of a "Halāl Menu," whether

one containing meat or otherwise, in the FCJ, as well as with regard to Ramadan accommodations.  As set forth in the Statement of Material Facts, the FCJ food services policy, including the General and Vegetarian/Vegan Plans, are rationally related to legitimate government interests including budgetary concerns, efficiency, and security.  Failure to obtain specifically halāl meat is likewise related to legitimate concerns regarding allocation of facility resources and security.  At present, the FCJ provides each inmate with a dietary plan that meets their specific nutritional, medical, or religious needs, in the most cost effective manner available to do so.  The single plan, with available vegetarian option, is integral to that process and clearly also to the proper functioning of the institution. Applying the Turner test in a nearly identical case, the Third Circuit granted summary judgment for prison officials, whose failure to serve halāl meat was supported by legitimate penological interests including simplified food service, prison security, and budgetary constraints.  See Williams v. Morton, 343 F.3d 212, 218 (3d Cir. 2003).

Alternative means exist for exercise of the right to adhere to an Islamic religious diet.  Courts have repeatedly found no free-standing constitutional right to meat, halāl or otherwise, in a correctional institution, and Defendants could locate no case in this federal circuit or any other mandating that Muslim inmates be provided specifically halāl meat.   The General Plan is compliant with an Islamic

religious diet.  If an inmate believes such would not comply with their religious preferences, the Vegetarian/Vegan Plan may be elected, and review of the ingredients demonstrates no forbidden foodstuffs are present. (See SMF ¶ 46, citing Ex. "13", Meal Plan Diet Load Sheets.)  In Riley, the Third Circuit noted that most Muslim inmates received the no animal products diet, or alternative protein diet, to be complaint with the dictates of Islamic practice, and that Riley never requested such, as evidence of the existence of alternative means for exercise.  Riley v. Decarlo, 532 Fed. Appx. 23, 28 (3d Cir. 2013).  Here, the Vegetarian Plan, containing ingredients that are without doubt halāl, provides a cost-effective, reasonable accommodation consistent with the operational and security needs of the institution.

Accommodation of the request for halāl meat, or creation of a "Halāl Menu" would place a substantial burden on prison resources.  (See SMF ¶¶ 55-56.) According to the Affidavit submitted by Warden Keen, the food services budget would be greatly exceeded and security of the institution compromised if the FCJ were forced to purchase halāl meat for Muslim prisoners.  (See id. at ¶¶ 38-41.) See also Overton, 539 U.S. at 133 (prison security is "perhaps the most legitimate of penological goals").  Further kitchen staff would be needed to prepare the meals timely for each meal service, further food deliveries would be required, and efficiency and simplicity in food service operations would be compromised.  (See

SMF ¶¶ 49-50, 55-58.)    Other sects could then also demand menus for their respective religious faith, with devastating effect to the budget, and good operation, of the facility.

No accommodations may be made at *de minimis* cost that are not already provided.  Plaintiff has alleged[1] that provision of kosher meals instead of the GPMP would constitute a ready alternative, ignoring each kosher meal costs $5.00, as opposed to the current meal costs at $1.18, and obtained only due to the intricacies of kosher law that preclude satisfaction of such diet from within the facility.  (See id. at ¶¶ 33, 36-37.)  In Riley, the Third Circuit affirmed the District Court's grant of summary judgment upon a like claim, stating:

> [T]he DOC does not provide a Halāl meat diet because such a diet would significantly impact prison resources . . . . Additional staff would be needed to check the food deliveries for security purposes, and kosher meat would also need to be ordered for Jewish inmates to avoid equal protection problems. Accordingly, Appellees have demonstrated a legitimate government objective underlying its decision not to serve a Halāl meat diet. Furthermore, Appellees have submitted evidence that Riley has been provided numerous opportunities to request the no animal products diet but has refused to do so. Therefore, Riley has alternative ways of observing his religious beliefs. Likewise, Appellees have satisfied the third and fourth Turner factors by demonstrating the

---

[1] In his grievances, though not, it must be noted, in the Complaint, Plaintiff intimates accommodation should be made by providing Kosher meals to Muslim inmates.

> deleterious impact serving a Halāl meat diet would have
> on other inmates, prison officials, and prison resources
> and by noting that an alternative—the no animal products
> diet—does already exist at *de minim*us cost.

Riley v. Decarlo, 532 Fed. Appx. 23, 28 (3d Cir. 2013).  As in Riley, based upon

the undisputed facts herein, FCJ food service and religious meals policies are

reasonably related to legitimate penological interests, and Defendants are entitled

to judgment in their favor, and against the Plaintiff, on such claims.  Cf. Garraway,

2012 U.S. Dist. LEXIS 38712, at *40-42 (finding failure to offer separate Halāl

Menu is not a First Amendment Free Exercise violation).

So, too, the failure to obtain special foodstuffs for the Ramadan feast, failure

to offer a "Ramadan Menu," and the accommodations offered for the holiday, are

reasonably related to legitimate penological interests, foreclosing Plaintiff's claims.

The policies are rationally related to legitimate governmental interests including

budgetary concerns and considerations of fair representation and equality.  As to

the feast and menu provided, Courts have clarified that the First Amendment

protects the right of individuals to engage in the practice of their religion, but does

not require the government to subsidize that right.  See Riley v. Beard, No. 08-

1675, 2011 U.S. Dist. LEXIS 32640, 2011 WL 1204264, *23 (W.D. Pa. March 29,

2011) (*relying on* Freedom of Religion Found, Inc. v. McCallum, 179 F. Supp.2d

950, 981 (W.D. Wis. 2002) (*citing* Regan v. Taxation with Representation of Washington, 461 U.S. 540, 546, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983))).

Neither in the Complaint nor via his Inmate Requests and Grievances, did Ealy provide specific reasoning the proposed feast and accommodations were improper, but Weller nonetheless investigated Ealy's complaint and determined the Feast served was proper according to Muslim law.  (See SMF ¶¶ 54, 60.)  In Banks, the Court found the policy of requiring inmates to purchase special foods and serving those who could not regular menu items had a valid connection to penological interests, and further stated that "Muslims are not required to celebrate with a feast meal."  See Banks, 2013 U.S. Dist. LEXIS 140629, at *30-31.  Given such concerns, the failure to offer a specific holiday menu or foodstuffs is clearly rationally related to legitimate interests including the budget of the facility.  So, too, any delay in provision of meals, whether due to emergencies, security issues or staff needs, or as a result of the necessity of an escort for each inmate to and from the chapel previous to service, are rationally related to security concerns, a legitimate interest.

Alternative means are offered, as an Eid Ul-Fitr feast is conducted in the chapel, along with communal prayer, and the menu served is compliant with Islamic dietary restrictions, however strictly a particular inmate may observe such, via the General or Vegetarian/Vegan Plans.  Indeed, the meals available to Islamic

inmates at all times, including for the month of Ramadan, provide a means for adherence to Islamic dietary restrictions.  Oranges are provided to break the fast previous to modified meal service, as close to the time of sunset as possible, and breakfasts were provided early, previous to sunrise.  Delays of generally less than five (5) minutes do not meaningfully interfere with such alternatives.

Rather than a *de minimis* accommodation, a Ramadan Menu would substantially burden institutional operations and order.  Special foodstuffs for the month of Ramadan or the Eid Ul-Fitr feast would increase costs and remove much of the benefit of the General and Vegetarian Plans.  Moreover, due to Equal Protection considerations, Catholic inmates could then demand a "Lent Menu," Jewish inmates a "Passover Menu," Greek Orthodox inmates a "Fast of the Apostles Menu," and Hindu inmates a "Navaratri/Saraswati Puja/Dussehra Menu," for example.  The various faith groups within the jail celebrate a multitude of holidays, with a variety of feasts and occasions of significance, such that provision of separate meals for each would likewise strain the budget and create security issues.  Accommodation of the various religious holidays of various faith groups within the facility via specific menus would have a disastrous effect on food service, good order and upon security, within the FCJ.

Similarly, warm breakfasts would entail payment of overtime to kitchen staff and correctional officers, adversely impacting the budget.  Obviously, staff cannot

ignore an exigent security issue such as a fight between inmates in favor of delivering holiday meals or oranges for the breaking of the fast at the exact moment of sunset.  Inmates cannot be permitted to travel unsupervised through the facility, so as to reduce travel time after congregational breaking of the fast in the chapel and accomplish more timely meal service, without compromising security. The FCJ policies clearly being reasonably related to legitimate penological interests, Defendants are entitled to judgment in their favor, and against the Plaintiff, as to any claims relating to religious meals or accommodations.

### 4. No Cognizable First Amendment Free Exercise Claim May be Made with Regard to the Islamic Materials Available in the FCJ

As pled in the Complaint, and given the undisputed facts, Plaintiff cannot prevail as a matter of law with regard to any claim regarding the Islamic materials available in the FCJ.  In addition to those texts the facility previously possessed, after Ealy requested various literature to bolster the collection of Islamic materials in the Chapel, Weller corresponded with him, researched the texts requested, and purchased several volumes.  (See SMF ¶¶ 70-71.)  Ealy was not provided with the Noble Qur'an[2], after a reasonable investigation which concluded to do so would provide inmates with inflammatory material which could threaten security.  (See

---

[2] As the Court noted in United States v. Sedaghaty, 728 F.3d 885, this edition of the Qur'an contains an appendix entitled "A Call to Jihad" which argues violent uprising is an obligation for Muslims.  See id. at 897.

id. at ¶¶ 72-74.)   Weller did not purchase every volume requested, but found and obtained several with clear willingness to continue building the collection as more materials were needed.   (See id. at ¶¶ 67-71.)   Ealy's request for additional materials, the first aside from a single other regarding an alternative version of the Qur'an, was accommodated in a manner rationally related to the legitimate interests of maintaining the FCJ budget, and security.

Alternative means for exercise of the right at issue are available.   Here, the facility maintained a collection previously, obtained additional volumes when requested, and a version of the Holy Qur'an, endorsed by the Islamic Society of Western Maryland, is available to inmates, and even provided to indigent inmates free of charge.   (See id. at ¶¶ 67-68, 73.)   Cf. Garraway (citing fact religious materials available to inmates via purchase through the commissary demonstrates alternative means existed for exercise of the right to religious study).   Inmates may use the available volumes in the chapel, or check them out for use individually in their cells, and Muslim inmates are afforded weekly opportunity for group religious study.

No further de minimis alternative means can be provided.   If Weller is unable to locate requested texts using the means at her disposal, then obtaining the volumes would strain financial and staffing resources.   Inflammatory materials which advocate violence cannot be given to inmates without seriously

44

compromising institutional security.  Caselaw is clear that restrictions on literature possessed by inmates are permissible where reasonably relating to penological interests, especially security.  See e.g., Garraway v. Lappin, 490 Fed. Appx. 440 (3d Cir. 2012) (no Free Exercise violation where inmates are limited to five (5) books each as personal property, where such was justified by various security concerns).  Clearly, the volume and substance of religious volumes and study materials is rationally related to legitimate penological interests, and does not present any Free Exercise violation.

As to the claim regarding prayer oils, the use of such has been accommodated in a manner consistent with security concerns, which is obviously a legitimate interest.  Moreover, in Banks v. Beard, this Honorable Court rejected an assertion by prisoners that the refusal to allow use of Muslim prayer oils violates the Free Exercise Clause given the serious security concerns their use created. Banks, 2013 U.S. Dist. LEXIS 140629, at *31-33 (oils could be stolen by inmates, sold to other inmates or used to manipulate them, and given their strong aroma, could also be used to mask the smell of other contraband).  Moreover, the Court found that the use of such oils was "optional" according to the dictates of Islam, but not required, such that no viable claim could be stated.  See id. Plaintiff clearly cannot make a claim and/or judgment should be entered in favor of Defendants as to any claims relating to the availability of Islamic materials.

**E.     Plaintiff Has Failed to Make Any Viable Section 1983 Claims Under the Establishment Clause**

The Establishment Clause of the First Amendment prohibits government from either promoting any religious doctrine or organization, or affiliating itself with one.  See County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 590, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989). A violation occurs if "the challenged governmental practice has the purpose or effect of 'endorsing' religion." Id. at 592.  Various tests have been articulated for analysis of Establishment Clause claims.  The traditional test, dubbed the Lemon test, provides that a challenged action is unconstitutional where it: 1) lacks a secular purpose, 2) has a primary effect of either advancing or inhibiting religion, or 3) fosters excessive entanglement of government with religion.  See Modrovich v. Allegheny County, 385 F.3d 397, 401 (3d Cir. 2004).

The Supreme Court has also developed an "endorsement test," applicable in cases of state participation in a religious activity.  See Tanafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 175 (3d Cir. 2002).  Under such test, the Establishment Clause is violated where "a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion."  Borden v. Sch. Dist. of Twp. of E. Brunswick, 523 F.3d 153, 175 (3d Cir. 2008).  In considering conduct or policy according to either test, the Supreme Court has long recognized that the government may "accommodate

religious practices" without violating the Establishment Clause.   <u>Cutter v.</u>
<u>Wilkinson</u>, 544 U.S. 709, 713--14, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2005).

Indeed, in the prison context, this principle is especially important, given the

correspondent dictates of the Free Exercise Clause.  The Court in <u>Mathis v. Manza</u>

aptly explained:

> Prisons deal with a unique area of tension between the
> establishment clause and the free exercise clause of the
> First Amendment.  Government cannot require persons to
> worship in particular ways and cannot aid, endorse, or
> promote particular religions. But where the government
> has total control over people's lives, as in prisons, a niche
> has necessarily been carved into the establishment clause
> to require the government to afford opportunities for
> worship . . . [A]lthough provisions in penal institutions
> might contravene the Establishment Clause, they would
> be sustained as necessary to secure the right to worship
> guaranteed by the Free Exercise Clause. Thus, in the
> prison context, the establishment clause has been
> interpreted in the light of the affirmative demands of the
> free exercise clause.

<u>Mathis v. Manza</u> , No. 11-450, 2012 U.S. Dist. LEXIS 17148, * 14-15 (W.D. Pa.

January 18, 2012) (citations omitted).

**1.    The Failure to Employ a Sunni Muslim Imam and Use of
Volunteers to Provide Religious Services Does Not Violate
the Establishment Clause**

Here, the employment of a single prison Chaplain reflective of the majority

of the inmate population has a valid secular purpose, as the Free Exercise Clause

requires the government make reasonable religious accommodations for prisoners,

and the facility has limited financial resources.  See, e.g., Young v. Beard, 284 Fed. Appx. 958, 963 (3d Cir. 2008).  The single Chaplain does not either inhibit or advance religion, nor does the failure to provide a Sunni Muslim Imam on a full-time basis.  Inmates are not required to participate in any religious programs, nor does the Chaplain provide any unsolicited or unwanted religious guidance, and volunteers and inmate-led services allow for congregational prayer by diverse groups.  The policy of the FCJ makes clear that under no circumstances will any inmate be forced to receive any religious services, and the institution does not endorse or encourage one type of service over another.  (See SMF ¶ 63.)  The services of both the Chaplain and the Volunteer Clerics merely give inmates the option, but do not oblige them, to follow their faith.  Cf. Mathis, 2012 U.S. Dist. LEXIS 17148, at *16.

Nor does the provision of a single Chaplain foster any excessive entanglement.  Indeed, Prison authorities do not direct the Chaplain in his religious services, nor does the prison endorse the services conducted by the Chaplain in any manner.  Rather, employment of the Chaplain accommodates services within the institution as required by the Free Exercise Clause, in light of budgetary constraints which simply do not allow the facility to employ a cleric for each religious denomination represented by the inmate population.  (See SMF at ¶¶ 52-53, 57-58.)  Volunteers of various persuasions are sought after and utilized to provide

48

alternative religious services, in order to accommodate the religious needs of prisoners. Such volunteers are also not directed in any manner by the FCJ, but rather merely allowed to visit the institution to provide religious services to those who so request. There is no excessive entanglement, the policies merely permitting inmate to freely exercise their particular religious beliefs.

Finally, no reasonable observer could view the failure to provide a Sunni-Muslim cleric as an endorsement of religion. Rather, the Chaplain's religious affiliation mirrors that of the majority of inmates in the FCJ, and can only be seen as a reasonable reflection of budgetary constraints. Indeed, provision of a Sunni-Muslim cleric, from the perspective of, for example, a Buddhist inmate, may well be viewed as an endorsement given the few Sunni Muslims incarcerated in the FCJ. Clearly, the FCJ policies regarding provision of religious services, and the failure to provide a Sunni Muslim Cleric, do not violate the Establishment Clause.

> **2.      Restriction on Congregational Prayer, Supervision of Services by the Chaplain, and Cancellation or Delays in Programming Do Not Violate the Establishment Clause**

Nor do the policies relating to congregational prayer, supervision of inmate-led services, or cancellation or delays in programming violate the Establishment Clause. No religious services are to occur outside the chapel, or unsupervised, regardless of denomination, due to security concerns, a valid secular purpose. Given the accommodations made to allow congregational prayer, such does not

inhibit nor advance religion, merely affording an opportunity for worship that is safe and consistent with the good order of the institution.  The policies do not create any entanglement, as all unsupervised or unauthorized congregational prayer is prohibited, and all inmate-led groups must be supervised.  Nor does either policy constitute an endorsement of religion.  No sect is allowed to orchestrate its own group religious activities, and the Chaplain takes care to afford each equivalent opportunities for religious practice, but it is clear the FCJ and its staff do not direct or endorse such practice.  Rather, religious worship is merely accommodated, as required by the Free Exercise clause.

Nor is any viable claim asserted with regard to cancellation or delay of religious programming.  Security and staffing concerns are valid secular purposes.  Programming continues as scheduled absent such occasional issues, and individual prayer is allowed even during cancellations or delays.  Security and staffing needs are the primary purpose of the regulations, rather than advancement or inhibition of religion.  Nor does such foster any excessive entanglement, as all programming may be similarly cancelled or delayed, and such has nothing to do with any religious notions or principles, and does not involve government in such.  For similar reasons, cancellations or delays cannot reasonably be viewed as any endorsement of religion.  Judgment is merited in Defendants favor, and against the Plaintiff, as to these claims.

3.     **No Cognizable Establishment Clause Claim May be Made Relating to the Menu Provided to Muslim Inmates, Either During Holidays or Generally**

Clearly, the Franklin County Jail Meal Plans have a secular purpose which is valid and well-supported, including reducing budgetary, staffing and operational needs, and enhancing security.   The facility's food service policies neither advance nor inhibit religion, rather accommodating the vast majority of religious diets at the same time as secular preferences, at a low cost and by practices advantageous for security and staffing purposes.   The policies foster no entanglement, rather providing an opportunity for adherence to religious dietary preferences without directing same.   The Meal Plans cannot be viewed as any endorsement of religion, whether on holidays or otherwise, rather merely providing opportunity for exercise of same, without supporting or inhibiting it.   Judgment is merited in Defendants favor, and against the Plaintiff, as to any such claims.

4.     **Jail Policies with regard to Religious Materials do not violate the Establishment Clause**

No realistic claim under the Establishment clause can prevail with regard to Ealy's claims relating to religious materials.   Obviously, when such are requested by the inmate population, their use and necessity is investigated, and such is accomodated where security, budgetary and staffing concerns allow.   Restriction of any requested materials clearly serves one of these valid secular purposes.   Prayer oils and rugs have been allowed, subject to security restrictions, providing

opportunity for religious practice without advancing or inhibiting same. Regulations relating to religious materials do not foster any excessive entanglement, rather moderating access to materials only so much as is required to satisfy the secular purposes of maintaining institutional security and order. Providing the opportunity for use of permitted religious materials cannot be perceived as any endorsement, but rather as provision of an opportunity for religious practice where such is requested and consistent with the operational needs of the facility. Thus, Defendants are likewise entitled to judgment in their favor, and against Plaintiff, on claims regarding religious materials.

### F. Any Claims Under the Equal Protection Clause of the Fourteenth Amendment Must be Dismissed and/or Judgment Entered in Defendants' Favor and Against the Plaintiff

The Turner v. Safley reasonableness analysis applies to Ealy's equal protection claims, just as it applied to the First Amendment claims. See DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000) ("Turner is equally applicable [to the equal protection claim], and the appropriate analysis for this claim is the same as that for [the] Free Exercise claim."). As set forth regarding Plaintiff's Free Exercise claims, *supra*, there is no doubt the requirements of Turner are satisfied herein, and given the undisputed facts, no valid Equal Protection claim can succeed as a matter of law. Yet additionally, as a threshold matter, in order to establish an equal protection violation, a plaintiff must "demonstrate that [he has] been treated

52

differently by a state actor than others who are similarly situated simply because [he] belongs to a particular protected class." <u>Keevan v. Smith</u>, 100 F.3d 644, 648 (8th Cir. 1996).

In alleging the failure to employ a full-time Imam, lack of "Halāl Menu," and amount of available religious materials violates Equal Protection, Ealy alleges only as to the first that other groups are treated differently.  The jail does indeed have a Christian clergymember, and does not have a representative of the Islamic faith, yet given the jail population, such is rationally related to financial concerns that are without doubt legitimate penological interests.  Volunteers and inmate-led activities provide an alternative means for exercise, and employing another full-time cleric or tendering reimbursement to volunteers is not a *de minimis* accommodation.  As to the claims regarding food service and religious materials, Ealy does not even allege other groups are treated differently, and acknowledges no other groups are permitted to congregationally worship in living or recreational quarters of the facility.

As to the claim regarding the prayer rug, there is no allegation members of other religious sects are permitted to sleep on the floor of their cells.  Further, courts have upheld even confiscation of Muslim prayer rugs on grounds of institutional security. <u>See</u>, <u>e.g.</u>, <u>Pressley v. Beard</u>, 266 Fed. Appx. 216 (3d Cir. 2008).  Plaintiff alleges he is not permitted to sleep on the floor on his prayer rug

due to security concerns, and does not state other sects are exempt. There is no viable Fourteenth Amendment claim pled, nor, given the undisputed facts, can Plaintiff hope to prevail as a matter of law, and judgment must be entered against him, and in favor of Defendants.

### G.    Has Plaintiff Failed to State an Eighth Amendment Claim?

The Eight Amendment's prohibition of cruel and unusual punishment forbids prison officials from subjecting prisoners to inhumane conditions of confinement. See Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care," and must "take reasonable measures to guarantee the safety of the inmates[.]'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). To establish a violation of the right to adequate medical care, evidence must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. See Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed 2d 251 (1976).

Here, Ealy's claim with regard to his sinus problems simply fails to satisfy the "serious medical need" prong of the test. Moreover, there is no indication of

any deliberate indifference.  Plaintiff does not plead he has suffered grievous injury by reason of the failure to allow him to sleep on the floor, nor even that the guards were aware he was sleeping on the floor due to his sinuses.  As in Hankins, Ealy has also failed to plead that any action or inaction caused or contributed to any injury.  Cf. Hankins v. Beard, No. 07-332, 2009 U.S. Dist. LEXIS 125619 (W.D. Pa. Nov. 30, 2009).  No viable Eighth Amendment claim has been pled.


### H.    Defendants are Entitled to Qualified Immunity

The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  In determining whether a defendant is entitled to qualified immunity, the court must ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation.  See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

The Supreme Court in Anderson v. Creighton, 483 U.S. 635, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987), clarified the standard.   Under Anderson, a Constitutional right is 'clearly established' where its contours are "sufficiently

clear" such that "a reasonable official would understand that what he is doing violates that right." Id. at 640.  Generally, there must be "sufficient precedent at the time of [the defendant's] action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001).  Qualified immunity questions should be resolved at the earliest possible stage of the litigation.  See Anderson, 483 U.S. at 646 n.2.  It is also important to note that "a necessary concomitant to the determination of whether the constitutional right asserted by plaintiff is 'clearly established' at the time the defendant acted, is the determination of whether the plaintiff has asserted a violation of the constitutional right at all." D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir. 1992).

As the discussion, *supra*, regarding the Free Exercise, Establishment and Equal Protection Claims makes clear, Defendants did not violate the Plaintiff's constitutional rights, and are entitled to immunity from suit.  Moreover, qualified immunity protects government defendants from liability absent "fair warning" that their actions violate a person's rights.  See Burns v. Pa DOC, 642 F.3d 163, 176 (3d Cir. 2011).  The Court must determine "whether a right is clearly established" by asking "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.  In order for an

official "to have 'fair warning' [...] that his or her actions violate a person's rights, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Burns</u>, 642 F.3d at 176.

Here, Defendants have clearly made sincere effort to reasonably accommodate Plaintiff's religious needs and requests as security, operational and budgetary concerns allow. Current caselaw provides no warning, whatsoever, that any policy with which Plaintiff takes issue is a violation of any constitutional right, and the instant facts contain no unreasonable acts such that immunity would be withheld. <u>Contra</u> <u>Romero v. Lappin</u>, 2011 U.S. Dist. LEXIS 86435, *9-12 (collecting cases) (*citing, for example,* <u>Rasul v. Rumsfeld</u>, 433 F. Supp. 2d 58, 59, 61 (D.D.C. 2006) (denying qualified immunity where right of Muslim detainees not to have heads forcibly shaved and Qur'ans thrown in the toilet was clearly established)).

The case law cited herein unequivocally demonstrates no clearly established rights are violated by any religiously related policy of the FCJ, and indeed, very often affirms their propriety. As the Court in <u>Romero</u> recognized, "when it comes to inmates' free exercise rights, officials walk through a veritable minefield of potential liability," making literally "hundreds of decisions every day to preserve the safety and security of the penitentiary and its inmates" which may expose them to suit. <u>Romero</u>, 2011 U.S. Dist. LEXIS 86435, at *13-14. No clearly established

right being violated by any of Defendants decisions herein, they are clearly entitled to qualified immunity, and the Plaintiff's claims against them must be dismissed and/or judgment entered in their favor.

## VI. <u>Conclusion</u>

For the good and sound reasons set forth herein, Defendants respectfully request that this Honorable Court grant their Motion to Dismiss and/or for Summary Judgment, and dismiss the claims against them asserted in the Complaint, and/or enter judgment in their favor and against the Plaintiff.

Respectfully submitted,

LAVERY FAHERTY PATTERSON

Date: May 12, 2014     By:   /s/ Jessica S. Hosenpud,
                                        Frank J. Lavery, Jr., Esquire
                                        Attorney I.D. No. 42370
                                        Jessica S. Hosenpud, Esquire
                                        Attorney I.D. No. 307656
                                        225 Market Street, Suite 304
                                        P. O. Box 1245
                                        Harrisburg, PA 17108-1245
                                        Phone: (717) 233-6633
                                        Facsimile: (717) 233-7003
                                        flavery@laverylaw.com
                                        jhosenpud@laverylaw.com
                                        Attorneys for Defendants

## <u>CERTIFICATION OF COUNSEL</u>

The undersigned counsel hereby certifies that the foregoing Brief complies with the Order of Court issued May 2, 2014, in response to Defendants' Motion to File Brief in Excess of 5000 Words, permitting the foregoing brief to contain more than 5,000.  The brief contains **13,702** words.  Counsel relied upon the word count feature of the word processing system used to prepare the brief in obtaining the foregoing number.

Respectfully submitted,

LAVERY FAHERTY PATTERSON

Date:  May 12, 2014          By:    /s/ Jessica S. Hosenpud,
                                    Frank J. Lavery, Jr., Esquire
                                    Attorney I.D. No. 42370
                                    Jessica S. Hosenpud, Esquire
                                    Attorney I.D. No. 307656
                                    225 Market Street, Suite 304
                                    P. O. Box 1245
                                    Harrisburg, PA  17108-1245
                                    Phone: (717) 233-6633
                                    Facsimile: (717) 233-7003
                                    flavery@laverylaw.com
                                    jhosenpud@laverylaw.com
                                    Attorneys for Defendants

## CERTIFICATE OF SERVICE

I, Amyra W. Wagner, Esquire, with the law firm of Lavery Faherty Patterson, do hereby certify that on this 12th day of May, 2014, I served a true and correct copy of the foregoing Brief in Support of Motion to Dismiss and/or Motion for Summary Judgment, via U.S. First Class mail, postage prepaid, addressed as follows:

Vernon L. Ealy, Jr.
SPECIAL MAIL, OPEN ONLY
IN PRESENCE OF INMATE
SCI-Camp Hill
Inmate #LL-3849
P.O. Box 200
Camp Hill, PA  17001-0200


s/ Amyra W. Wagner
Amyra W. Wagner

60