## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VERNON L. EALY, JR.,** | : | **CIVIL NO. 3:13-CV-2781** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **WARDEN DANIEL S. KEEN**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Plaintiff Vernon L. Ealy, Jr. ("Ealy"), an inmate formerly incarcerated at the Franklin County Jail, filed this civil rights action on November 14, 2013 (Doc. 1), naming as defendants the following individuals:  Daniel S. Keen ("Keen"), Warden; James Sullen ("Sullen"), Captain of Security; Russell R. Rouzer ("Rouzer"), Deputy Warden of Security; Marrow, Lieutenant; Jessica Sterner-Lensbower ("Sterner-Lensbower"), Director of Treatment; Michelle Weller ("Weller"), Deputy Warden of Treatment; and Chaplain Isaac Burkholder ("Burkholder").  Presently ripe for disposition is defendants' motion (Doc. 16) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and/or motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the motion for summary judgment will be granted.

## I.    Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty

and unnecessary formality.  See FED. R. CIV. P. 56(c).  The burden of proof is upon the

non-moving party to come forth with "affirmative evidence, beyond the allegations of the

pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311,

315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317,

322-23 (1986).  "'The non-moving party may not simply sit back and rest on the allegations

in the complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by

the depositions, answers to interrogatories, and admissions on file, and designate specific

facts showing that there is a genuine issue for trial.'  Celotex [ ], 477 U.S. [ ] 324 [ ] (1986)

(internal quotations omitted)."  Schiazza v. Zoning Hearing Bd., Fairview Twp., York

County, Pa, 168 F. Supp. 2d 361, 365 (M.D. Pa. 2001).  This evidence must be adequate, as a

matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only

if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## II.     **Statement of Material Facts**

"A motion for summary judgment filed pursuant to FED. R. CIV. P. 56 shall be

accompanied by a separate, short and concise statement of the material facts . . . as to which

the moving party contends there is no genuine issue to be tried."  See L.R. 56.1.  The

opposing party shall file a separate statement of the material facts as to which it is contended

that there exists a genuine issue to be tried.  Id.  "All material facts set forth in the statement

required to be served by the moving party will be deemed to be admitted unless controverted

by the statement required to be served by the opposing party." <u>Id.</u>  Because Ealy failed to oppose defendants' statement of material facts, despite being ordered to do so,  all facts contained therein are deemed admitted.  (<u>See</u> Doc. 24).

Ealy is a Sunni Muslim formerly incarcerated in the Franklin County Jail ("FCJ"). He entered the FCJ on April 3, 2013, and remained there until he was transferred to the State Correctional Institution at Camp Hill. (Doc. 17, ¶ 7). Defendant Keen, is the Warden of the FCJ.  His duties are to supervise and direct department staff, oversee facility operations, and develop and implement policies for the overall efficiency and orderliness of operations.  (<u>Id.</u> at ¶ 1).  Defendant Weller, is Deputy Warden for Inmate Services.  (<u>Id.</u> at ¶ 2).  She reports directly to Keen.  (<u>Id.</u>)  Her duties include overseeing treatment, religious and medical services provided to the inmate population.  (<u>Id.</u>)  She has spent considerable time familiarizing herself with the practices of a variety of religious affiliations in order to properly provide for the religious needs of inmates.  (<u>Id.</u> at ¶ 10).  She has also specifically familiarized herself with Islamic religious practice.  (<u>Id.</u>)  Weller routinely contacts representatives of various religions with questions regarding their practice and procedure, when faced with inmate questions or requests on religious matters of which she lacks prior or detailed knowledge.  (<u>Id.</u>)  Upon receiving a request based upon an asserted religious practice, dietary or otherwise, she reaches out to members of the relevant religious community to validate whether the request comports with the tenants of the inmate's religion. (<u>Id.</u> at ¶ 11).  She also relies on her personal knowledge, reference materials, and inmate input.  (<u>Id.</u>)

Defendant Sullen is the Captain of Security.  (<u>Id.</u> at ¶ 3).  His duties include overseeing the care, custody and control of inmates, overseeing the security of the facility, heading the training academy, and conducting internal investigations.  (<u>Id.</u>)  As Director of Treatment, defendant Sterner-Lensbower's responsibilities include overseeing case management services provided to inmates and responding to the first stage of the inmate grievance process.  (<u>Id.</u> at ¶ 4).  Defendant Morrow, is a Correctional Officer holding the rank of Lieutenant.  (<u>Id.</u> at ¶ 5).  Morrow assists in the care, custody and control of inmates and serves as a supervisor on the 4:00 o'clock p.m. to 4:00 o'clock a.m. shift.  (<u>Id.</u>)

### A.    Religious Policies and Practices

The FCJ has a strict policy of not requiring inmates to participate in religious services, and not favoring one type of service over another.  (Doc. 17, ¶ 75).  It employs one full-time Chaplain to service the religious needs of the inmates held at the facility, provided through a contractual agreement with the United Churches of the Chambersburg Area, at a cost of $18,000.00 per year.  (<u>Id.</u> at ¶ 12).  The qualifications for the Chaplain are set by the Warden, and the Chaplain is to assure equal status and protection for all recognized religions represented in the inmate population.  (<u>Id.</u> at ¶ 13).  The Chaplain is also responsible for maintaining a schedule of religious activities and worship services catering to all recognized religions represented in the inmate population and to disseminate that schedule.  (<u>Id.</u> at ¶ 14).  While the Chaplain does provide religious counseling and services to all inmates if so requested, regardless of religious affiliation, Volunteer Clergy from various denominations and affiliations visit the jail to provide services specifically to the adherents of their particular

4

faith.  (Id. at ¶ 15).  Upon receiving a request from an inmate for clergy of a particular faith, the Deputy Warden for Inmate Services and the Chaplain make inquiry of nearby organizations to find a person to conduct services.  (Id.)  The services of both the Chaplain and the Volunteer Clerics are to provide inmates the option, but do not oblige them, to follow their particular faith during their incarceration.  (Id.)

There is no full-time Rabbi to service Jewish inmates, Apostle to service Mormon inmates, Preacher to service Protestant inmates, Monk, Lama, or Scholar to service Buddhist inmates of various sects, Brahmin to service Hindu inmates, or Guru to service Sikh inmates. (Id. at ¶ 16).  There is no full-time Shia Muslim cleric.  (Id.)  There is also no full-time cleric to service Eastern Rite Catholic inmates, Asatru inmates, Native American inmates of various tribes, Rastafarian inmates, Roman Catholic inmates, Eastern Orthodox inmates, or Wiccan inmates.  (Id.)  At present, there is no volunteer Imam to provide religious services, including leading Taleem studies or officiating Jumu'ah Friday prayer, to Muslim inmates. (Id. at ¶ 17).

Of the 371 inmates currently housed in the FCJ, six  identify as Muslim, none of which describe themselves as specifically Sunni.  (Id. at ¶ 18).  There is also one Buddhist inmate, one Satanist inmate, and one German Baptist inmate. (Id.)  The majority of inmates identify themselves as "Christian," without specification. (Id.)  Other religious denominations have been represented in the inmate population in the past, and the number of inmates in each denomination represented have in the past been both greater, and fewer, than at  present. (Id.)

Taleem is the urdu word for "education," and denotes a program of education including recitation and review of the Qur'an, the holy book of Islam, as well as of the Hadith and Sunnah, which are libraries cataloging the teachings of the Prophet Muhammad. (Id. at ¶ 19).  During Taleem, the teachings of Islam are discussed and meditated upon.  (Id.) Jumu'ah is a congregational prayer held by Muslims every Friday, just after noon, involving a sermon, recitation of traditional prayers, and a congregational prayer, which is traditionally led by an Imam but may be led by an adult male member of the Islamic community.  (Id.) The Jumu'ah is obligatory for Muslim men above the age of puberty, and requires they pray in congregation either in a mosque or with a group of Muslims.  (Id.)

In 2004, the FCJ had an arrangement with an Imam referred to the institution by the Islamic Society of Western Maryland.  (Id. at ¶ 20).  The Imam was an unpaid volunteer, and traveled from Maryland to the FCJ to conduct Jumu'ah services once per month, and lead prayer sessions during Ramadan.  (Id.)  The visits ceased at the end of the Ramadan holiday in 2005, because the Imam traveled to the FCJ and found no inmates wished to participate in services.  (Id.)  That Imam has declined the invitation to return.  (Id.)

Since 2006, FCJ officials have made inquiries with a variety of Islamic societies and Mosques regarding a volunteer Imam, but have been unable to locate one.  (Id. at ¶ 21). Many of the organizations and clerics contacted requested compensation for their time and travel expenses.  (Id.)  The location of the jail makes finding a volunteer difficult.  (Id.) Officials continue their efforts to locate a volunteer.  (Id.)

The FCJ does not have the financial resources to compensate the clerics of any

religious organization or sect to provide religious services to inmates. (Id. at ¶ 22). Because of the limited budget, if the FCJ were to compensate the clerics of various faiths, sects, and sub-sects thereof for providing religious services, it would be unable to provide other vital educational and treatment services to inmates, and would be required to reduce correctional officers and other vital staff, threatening the good order of the institution. (Id. at ¶ 23).

Defendant Burkholder, is the sole Chaplain employed by the FCJ, his services being provided through Prison Ministries, Inc. (Id. at ¶ 6). He oversees and delivers individual and group religious programming and counseling. (Id.) His specific duties include assuring equal status and protection for all recognized religions; developing a schedule of religious activities that provides for inmates of all religious denominations and disseminating the program; monitoring scheduled activities for content and suitability, providing counseling, providing advice on religious matters, maintaining connections with religious resources in the community, and being available to inmates regarding religious matters. (Id.) He has a good knowledge of Islamic practice and a deep respect for all forms of religious faith. (Id. at ¶ 27).

There are a variety of groups which utilize the FCJ chapel on a weekly basis to conduct religious activities. (Id. at ¶ 25). Inmates are permitted to utilize the chapel for formal worship one time per week, regardless of religious denomination. (Id. at ¶ 26). At present, Muslim Inmates are accorded a space and provided with necessary materials for their weekly use in the Chapel to conduct inmate-led Taleem Studies, Jumu'ah Services, and other Islamic religious functions. (Id. at ¶ 24). They are supervised during worship by

7

defendant Burkholder.  (<u>Id.</u>)

Ealy's request for additional Islamic classes could not be accommodated due to the busy chapel schedule and lack of staff available to provide supervision.  (<u>Id.</u> at ¶ 25). Supervision by the Chaplain is required for security reasons, including the potential for disagreements between inmates or with staff, the appearance of a recruitment session, or participation in a disturbance by innocent attendees.  (<u>Id.</u> at ¶ 28).  Ealy attended Muslim study and worship in the chapel, and was given the opportunity to act as an inmate-leader of Muslim study and religious services.  (<u>Id.</u> at ¶ 8).  Where a service is inmate led, and the inmate leader strays from religious topics to discuss jail policy or administration, the Chaplain redirects the service back to religious worship for security purposes.  (<u>Id.</u> at ¶ 28). In such cases when Burkholder has been required to re-direct services led by Ealy, he has done so because Ealy utilized the time to criticize or question jail policy and administration, and to urge other inmates to make demands regarding religious policies.  (<u>Id.</u> at ¶ 29). Defendant Burkholder has not acted to disrupt religious practice of Muslim inmates, nor any other inmate-led group he supervises in the facility.  (<u>Id.</u> at ¶ 30).

Inmates are also allowed to engage in daily individual prayer.  (<u>Id.</u> at ¶ 31).  They are not permitted to independently organize congregational prayer in any part of the jail.  (<u>Id.</u>) Rather, group religious activities are regulated under the FCJ SOP 400.13, which dictates congregational prayer occur under the supervision of the Chaplain.  (<u>Id.</u> at ¶ 32).  No inmates of any religious affiliation are permitted to engage in group prayer activities either inside the jail or in the recreational yard.  (<u>Id.</u>)  This prohibition is based upon security and other

concerns including possible interference in required recreational time for other inmates, possible disturbances, and that such may impede necessary movement by jail staff.  (Id. at ¶ 33).

Religious and other programming is subject to occasional interruptions, delays, or cancellations due to security needs, including, *inter alia*, emergency head-counts, fights between inmates, medical emergencies, and short staffing.  (Id. at ¶ 34).  Programming may also be disrupted by Call of the Criminal Trial List, which occurs every six weeks in a Courtroom for the Franklin County Court of Common Pleas which is located in the jail.  (Id. at ¶ 35).  The disruption is a result of a lock-down imposed when court is in session.  (Id.)

The FCJ accommodates the various religious holidays celebrated by the members of the inmate population as security and budgetary concerns will allow.  (Id. at ¶ 36).  For the Muslim holiday of Ramadan, numerous accommodations are made, including being provided with breakfast before sunrise and dinner at sunset.  (Id. at ¶ 37).  Though security needs may occasionally cause delays of several minutes from the exact time of either sunrise or sunset, staff takes care to serve meals and provide fruit for the breaking of the fast each day at the proper times.  (Id.)  In 2013, after Ealy requested the inmates be permitted to break their fast in the chapel, arrangements were made to permit them to do so.  (Id.)  Thus, Muslim inmates were offered the opportunity for group prayer in the chapel before the evening meal, and could break their fast with an orange on their unit, report to the chapel for prayer, and then return to their unit for the evening meal.  (Id.)  Inmates may sign up to participate in the Eid Feast, which is held in the chapel. The food served for the feast is the same as that given to

9

inmates generally.  (<u>Id.</u>)

### B.     Food Service

Trinity Services Group, Inc., is the food provider for FCJ.  (Doc. 17, ¶ 41).  The dietary plan operates on a four-week General Population Meal Plan ("General Plan") cycle, comprised of both meat and vegetarian items, which has been approved by a Licensed Dietician-Nutritionist, who has affirmed that the meals provide a nutritionally adequate diet averaging 3000 calories per day, satisfying the Recommended Dietary Allowances for major nutrients required for adult males and satisfies the dietary needs of the broadest segment of the inmate population.  (<u>Id.</u> at ¶¶ 42-43).  The use of a general meal plan simplifies food preparation and increases efficiency, as there are no novel or unique ingredients that are served to some persons and not to others, it allows the FCJ to service the dietary needs of inmates with only three full-time and one part-time kitchen staff, and it reduces the need for security checks for deliveries of kitchen supplies, as the ingredients of the meals are the same and are all delivered at once by the same provider.  (<u>Id.</u> at ¶¶ 48-50).

FCJ  policy provides that inmates observing special religious dietary laws will be provided a diet that meets the recommended daily allowance, as recommended by the National Academy of Science and which complies with the religious and dietary laws.  (<u>Id.</u> at ¶ 39).  The provision of such a diet must be consistent with the secure and orderly operation of the facility.  (<u>Id.</u>)  FCJ policy additionally provides:

> 5.3.1 Religious diets will be provided for inmates whose religious beliefs require the adherence to religious dietary laws.

> 5.3.2 Religious diets may be recommended by the Chaplain to the Deputy Warden of Inmate Services. The Deputy Warden of Inmate Services or designee will approve all religious diets.
>
> 5.3.3 The recommendation will include the reason for the request, the duration of the proposed change, and the proposed menu changes.
>
> 5.3.4 The burden of proof that the meal is an essential tenet of a sincerely held religious belief will be the responsibility of the requesting inmate.

(Id. at ¶ 40).

The General Plan comports with the Muslim religious diet guidelines as set forth by the United States Department of Justice in that it does not contain pork, pork by-products, or pork derivatives, and contains no blood, carnivorous animals, reptiles, or insects, and no alcohol. (Id. at ¶ 44). With the exception of the purchase of pre-packaged kosher meals for Orthodox Jewish inmates, the dietary needs of the inmates of every religious sect represented within the facility are provided for under the General Plan or the Vegetarian/Vegan Plan. (Id. at ¶ 51). The determination to purchase pre-packaged kosher meals was the most cost effective means to provide for the dietary needs of Jewish inmates, given the prohibitive cost of creating and maintaining a kosher kitchen inside the FCJ. (Id. at ¶ 52).

Trinity Services Group, Inc., and FCJ kitchen staff have assured defendants that the General Plan and Vegetarian/Vegan Plans comport with Muslim religious diet requirements and Ealy's religious needs for the Eid feast and otherwise. (Id. at ¶¶ 53, 60). Upon receiving Ealy's requests and grievances concerning the Eid Feast, Weller contacted the Hadee Mosque, in Harrisburg, Pennsylvania, and spoke to an Imam regarding whether any special food was needed for the feast, and was told no special items were needed. (Id. at ¶ 54). She

11

was also assured the feast need not be prepared by Muslim individuals to qualify as Halal. (Id.)  If the FCJ were required to provide a specific "Halāl Meal Plan," or "Halal Menu" as requested by Ealy, much of the benefits of the General Plan would be removed, as multiple plans would be prepared in the FCJ kitchen.  (Id. at ¶ 55).  This would complicate food service, require the hiring of more kitchen staff, and adversely affect efficiency.  (Id.)  If a "Halāl Meal Plan" or "Halāl Menu" were required, the FCJ would also need to provide a "Buddhist Meal Plan," "Sikh Meal Plan," and other meal plans for various faiths which are all now provided by the General Plan and/or Vegetarian/Vegan Meal Plans.  (Id. at ¶ 56).

A separate 'Halāl Meal Plan' would be an enormous expense, and would place a substantial strain on prison resources, impacting the ability of the FCJ to provide other services to inmates.  (Id. at ¶ 57).  The jail would be required to reduce the number of correctional officers employed, as well as reduce the rehabilitative and educational services provided to inmates, thereby affecting the institutional order, and the safety and security of remaining staff and the inmate population.  (Id.)

Bagged breakfasts are prepared for the Ramadan fast by kitchen staff each night for consumption the following morning, due to staffing and budgetary concerns, reducing the overtime paid to workers and correctional officers in the early morning hours.  (Id. at ¶ 59). Pressing security needs may delay food service, both in general and on religious holidays. (Id. at ¶ 61).  During the Ramadan fast, service of meals was at most forty-five minutes delayed, but generally delayed less than five minutes.  (Id.)  The distribution of oranges to Muslim inmates in their cells has occasionally been delayed by several minutes due to

12

pressing security needs.  (Id. at ¶ 62).  Additionally, when Muslim inmates break the fast in the chapel, the time they are retrieved from their cells to travel to the chapel is even more subject to security needs, as correctional officers must retrieve each inmate individually and escort them to the chapel.  (Id.)

### C.     Prayer Oils

Ealy's  request that Muslim inmates be permitted to use prayer oils during worship was discussed by administrators, who had security concerns.  (Doc. 17, ¶ 64).  These concerns included that the oils could mask the scent of other contraband; be used for illicit trades or purposes; be used to threaten other inmates, as perfumes and like products are not allowed in the facility; or provide a means for inmates to slide out of restraints.  (Id.)  Despite these concerns, as of February 2014, Muslim inmates have been permitted to use prayer oils during inmate led services in the chapel.  (Id. at ¶ 65).  The oils are retained in the chapel by defendant Burkholder and administered at the beginning of services.  (Id.)

### D.     Availability of Religious Materials

Inmates are made aware *via* the Inmate Handbook that religious materials of various faiths are available for purchase in the FCJ Commissary, including the Holy Qur'an.  (Doc. 17, ¶ 67).  There are additional religious materials kept in the chapel for use by inmates either during religious worship or for check-out for a limited period.  (Id. at ¶ 68).  The Islamic texts in the FCJ chapel for use by inmates include: the Holy Qur'an, complete multi-volume Hadith, The Arabic Alphabet, The Prophet Mohamad, and two volumes by Imam Ibn Katir.  (Id. at ¶ 69).

13

Beginning in July 2013, Ealy provided a list of requested additional materials for use by Muslim inmates to defendant Weller, who over the following months attempted to research, review, locate, and purchase same.  (Id. at ¶ 70).  Weller purchased many of the requested materials for use by Islamic inmates.  (Id. at ¶ 71).  These books, as well as others regarding Islamic law and practice previously owed by the facility, are kept in the chapel and inmates are permitted to check out the materials.  (Id.)

Ealy requested that the Nobel Qur'an be purchased for Muslim inmates.  (Id. at ¶ 72). Upon investigation, defendants Keen and Weller learned that the Pennsylvania Department of Corrections deems the Nobel Qur'an version of the Qu'ran too radical to be provided to inmates.  (Id. at ¶ 73).  In speaking with Chaplain Burkholder, and upon further review, it was found that this version of the Qur'an is considered extreme by most mainstream Muslim religious authorities and that the version already provided by the facility is approved by the Western Maryland Islamic Society.  (Id.)  Consequently, the Nobel Qur'an was not purchased.  (Id. at ¶ 73).

### E.      Sleeping Requirements

Inmates are required to sleep on their assigned bunks in their assigned cells.  (Doc. 17, ¶ 76).  The requirement that inmates sleep on their assigned bunks arises from security and safety concerns.  (Id. at ¶ 77).  Correctional officers must be able to easily view an inmate during the nighttime hours to ensure their presence and their safety.  (Id.)   Additionally, pursuant to The Pennsylvania Administrative Code, Title 37, Chapter 95, Section 95.229, inmates must be provided a sleeping surface which allows them to be at least twelve inches

14

off the floor.  (Id.)

Should medical or religious accommodations relating to sleeping arrangements be necessary, the inmate may submit an Inmate Request.  (Id. at ¶ 76).  On July 4, 2013, and again on July 7, 2013, Ealy submitted Inmate Grievances with regard to sleeping on the floor of his cell, after he was repeatedly admonished by various correctional officers not to sleep on the floor given the policy.  (Id. at ¶ 78).  He submitted an Inmate Request slip on the same subject on July 7, 2013.  (Id.)  Upon investigation of his purported medical reason for requesting to sleep on the floor of his cell, prison medical providers assured defendants that no medical reason prevented Ealy from sleeping on his assigned bunk. (Id. at ¶ 79).

## III.   **Discussion**

### A.     **Religious Land Use and Institutionalized Persons Act of 2000**

Section 3 of Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2).  RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); see also Cutter v. Wilkinson, 544 U.S. 709, 715 (2005).

Although Congress intended that RLUIPA be construed "in favor of broad protection of religious exercise," see 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts

would apply the Act's standard with 'due deference to the experience and expertise of prison

and jail administrators in establishing necessary regulations and procedures to maintain good

order, security and discipline, consistent with consideration of costs and limited resources.'"

Cutter, 544 U.S. at 723.  Congress indicated that in the event an inmate's request for religious

accommodation would "become excessive, impose unjustified burdens on other

institutionalized persons, or jeopardize the effective functioning of an institution, the facility

would be free to resist the imposition."  Id. at 726.

   Under RLUIPA, the plaintiff must show that his religious exercise has been burdened

substantially by the challenged conduct.  Washington v. Klem, 497 F.3d 272, 277-78 (3d Cir.

2007).  The Third Circuit Court of Appeals has found that for the purposes of RLUIPA, a

substantial burden exists where:  "1) a follower is forced to choose between following the

precepts of his religion and forfeiting benefits otherwise generally available to other inmates

versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the

government puts substantial pressure on an adherent to substantially modify his behavior and

to violate his beliefs.  Id. at 280.  If the plaintiff shows that prison administrators' action or

inaction has imposed a substantial burden on the exercise of his religion, the prison

administrator must establish that the challenged conduct furthers a compelling governmental

interest and that it is the least restrictive means of furthering that interest.  Id. at 283.

   It is first noted that Ealy cannot recover compensatory or punitive damages against

defendants in either their individual or official capacities under RLUIPA.  In 2012, in the

matter of Sharp v. Johnson, 669 F.3d 144 (3d Cir. 2012), in considering this very issue, the

United States Court of Appeals for the Third Circuit stated that "the Courts of Appeals for the Fourth, Fifth, Seventh and Eleventh Circuits—the only circuits we are aware of that have addressed this issue in precedential opinions—have rejected arguments similar to Sharp's and held that RLUIPA does not permit actions against government employees in their individual capacities. See, e.g., Nelson v. Miller, 570 F.3d 868, 886–89 (7th Cir. 2009); Rendelman v. Rouse, 569 F.3d 182, 186–89 (4th Cir. 2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 327–29 (5th Cir.2009); Smith v. Allen, 502 F.3d 1255, 1271–75 (11th Cir. 2007), abrogated on other grounds, Sossamon v. Texas, —— U.S. ——, 131 S.Ct. 1651, 1654, 179 L.Ed.2d 700 (2011) (abrogating Smith as to the claim against government employees in their official capacities)." Sharp, 669 F.3d at 153-54. The Third Circuit joined those circuits in concluding that RLUIPA does not permit an action against defendants in their individual capacities. Id. at 155.

To the extent that Ealy seeks declaratory or injunctive relief against defendants at FCJ, his claims are moot because he is no longer incarcerated at that facility. He no longer presents a live case or controversy for injunctive relief regarding the policies or practices at FCJ because an injunction where he is no longer imprisoned would not provide him meaningful relief. See Abdul–Akbar v. Watson, 4 F.3d 195, 206–07 (3d Cir.1993). Further, on this record, any future incarceration of Ealy at FCJ is speculative, so his case not does not present an issue capable of repetition, yet evading review regarding the relief against the FCJ defendants. See id. Although "[t]he mootness of a . . . claim for injunctive relief is not necessarily dispositive regarding the mootness of . . . [a] claim for a declaratory judgment,"

17

Jordan v. Sosa, 654 F.3d 1012, 1025 (10th Cir.2011), Ealy's claims for declarations are similarly moot, see id. at 1027–28 (10th Cir.2011) (explaining that prison-specific claims are moot on transfer because a declaration that a prisoner was wronged at institution where he no longer resides has no effect on a defendant's behavior toward him).

**B.      Constitutional Claims**

Ealy also alleges that defendants' conduct violated his First, Eighth, and

Fourteenth Amendment rights.  Section 1983 of Title 42 of the United States Code

offers private citizens a cause of action for violations of federal law by state officials.

See 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95

F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege

"the violation of a right secured by the Constitution and laws of the United States,

and must show that the alleged deprivation was committed by a person acting

under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

1.      First Amendment

*a.      Free Exercise Clause*

The First Amendment to the United States Constitution is made applicable

to the states by the Fourteenth Amendment.  Cantwell v. Connecticut, 310 U.S. 296,

303 (1940).  It provides, *inter alia*, that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof . . . "  U.S. CONST. amend.

I.  The First Amendment offers protection for a wide variety of expressive activities.  See id.

These protections are lessened, but not extinguished, in the prison context, where legitimate

penological interests must be considered in assessing the constitutionality of official conduct.

Turner v. Safley, 482 U.S. 78, 89 (1987).  Although prisoners must be afforded "reasonable

opportunities" to exercise the religious freedoms guaranteed by the First Amendment, see

Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions

on some constitutional rights, including the First Amendment right to the free exercise of

religion.  O'Lone v. Shabazz, 482 U.S. 342, 348-49 (1987).  Only beliefs which are both

sincerely held and religious in nature are entitled to constitutional protection.  Wisconsin v.

Yoder, 406 U.S. 205, 215-19 (1972); Dehart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000); see also

Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981) (identifying three indicia of

religion as (1) attempting to address "fundamental and ultimate questions having to do with

deep and imponderable matters," (2) being "comprehensive in nature," consisting of a "belief

system" rather than "isolated teachings," and (3) recognizing the "presence of certain formal

and external signs" such as the clergy and observance of holidays).

    The parties do not dispute that Ealy's sincerely held religious beliefs are entitled to

constitutional protection.  The question before the court is whether the defendants' practices

violated Ealy's right to freely exercise those beliefs.  To answer this question, the court must

consider whether defendants' practices violate the Supreme Court's "reasonableness test."

See Turner, 482 U.S. at 89; O'Lone, 482 U.S. at 349. The test examines four factors:  (1)

whether the practice in question furthers a legitimate governmental interest unrelated to

suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners, and the effect on prison resources in general; and (4) whether an alternative exists which would fully accommodate the prisoners' rights at de minimis cost to valid penological interests. Thornburgh v. Abbott, 490 U.S. 401, 415–18 (1988) (citing Turner, 482 U.S. at 89-91).  The test's objective "is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity."  DeHart, 227 F.3d at 59.  However,  prison officials are not required to choose the least restrictive means possible in trying to further penological interests, Thornburgh, 490 U.S. at 411, and it is the plaintiff's burden to disprove the validity of a regulation or practice.  Williams v. Morton, 343 F.3d 212, 217 (3d Cir. 2003) (citing Overton v. Bazzetta, 539 U.S. 126 (2003)).

Defendants have established that the policies and practices related to the employment of a full-time Iman, the religious services policy, restrictions on communal prayer, use of the chapel, supervision of religious services, use of prayer oils, meal preparation and distribution, and religious materials satisfies the "reasonableness test." See Turner, 482 U.S. at 89; O'Lone, 482 U.S. at 349.  The policies and practices with respect to every area challenged by Ealy further a legitimate governmental interest unrelated to suppression of expression.  There is simply nothing in the record to lead the court to conclude that Ealy's ability to practice his faith was restricted or that he was prohibited from practicing his religion in any manner.  For

instance, he was provided opportunities to practice his religion on a regular basis in the

facility's chapel.  "A special chapel or place of worship need not be provided for every faith

regardless of size; nor must a chaplain, priest, or minister be provided without regard to the

extent of the demand." Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972) (*per curiam*); see also

Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970) (no affirmative duty to provide an

inmate with a clergyman of his choice).  Also, the fact that FCJ provided a general Chaplain,

who scheduled and supervised Muslim worship, was permissible.  Providing Chaplains for

only the largest major faith groups and prohibiting group worship in the absence of an

approved faith group leader, when faced with legitimate budgetary constraints and security

concern, is permissible under the First Amendment.  See Smith v. Kyler, 295 F. App'x 479,

481 (3d Cir. 2008).  Further, restricting religious practice in the prison yard is permissible

when other means of worship are available.  See Smith, 295 F. App'x at 483-84.  The

inability to provide Halal meals due to the substantial burden it would place on prison

resources, did not impermissibly curtail Ealy's right to free exercise of his religion as all

indications from the record are that the General Plan satisfied  Halal meal requirements.  See

Williams v. Morton, 343 F.3d 212, 220 (3d Cir. 2003) (rejecting inmate's claim that failure

to provide Halal meat in lieu of vegetarian meals violated their First Amendment rights); see

also Abdul-Aziz v. Ricci, 569 F. App'x 62, 66-67 (3d Cir. 2014).  Also, the decision to ban

prayer oils because they could mask the scent of other contraband, be used for illicit trades or

purposes, be used to threaten other inmates, or provide a means for inmates to slide out of

restraints, was clearly permissible as it was security driven and had no basis in the free

22

exercise of religion.  See Banks v. Beard, No. 14-4081, 2015 WL 509515, at *5 (3d Cir. Feb. 9, 2015).  Finally, although Ealy's request for a certain version of the Qur'an was denied, based on legitimate security concerns, he had access to the Qur'an endorsed by the Islamic Society of Western Maryland and to additional religious materials.  There is nothing in the record that suggests that he was deprived of texts that provided critical religious instruction.  See Sutton v. Rasheed, 323 F.3d 236, 255-56 (3d Cir. 2003).

Significantly, the party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).   Ealy simply submits a two-page opposition "motion" wherein he reasserts the same conclusory allegations contained in his complaint.  He has failed to come forward with any evidence and, consequently, has failed to raise a genuine issue of material fact with respect to any of his free exercise claims.

### b.    Establishment Clause

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  In analyzing such claims, the Supreme Court has traditionally applied a test termed the "*Lemon*" test, under which "the challenged action is unconstitutional if (1) it lacks a secular purpose, (2) its primary effect either advances or inhibits religion, or (3) it fosters an excessive entanglement of government with religion." Modrovich v. Allegheny County, 385 F.3d 397, 401 (3d Cir.

23

2004).

Because Ealy's claim involves state participation in a religious activity,   Borden v. Sch. Dist. of Twp. of E. Brunswick, 523 F.3d 153, 175 (3d Cir. 2008), also applicable is the "endorsement" inquiry.  The relevant question is "whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion."  Borden, 523 F.3d at 175 (quoting Modrovich, 385 F.3d at 401).  Thus, when the government "affirmatively supports religion on preferential terms," its actions violate the Establishment Clause under the endorsement test.  Tenafly Eruv Ass'n v. Borough of Tenafly, 309 F.3d 144, 175 (3d Cir.2002) (citation omitted).

 "The touchstone for [its Establishment Clause] analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.' "  McCreary County v. ACLU of Ky., 545 U.S. 844, 860(2005) (citations omitted).  The notion of governmental neutrality is an important guide, but it is not a rigid rule.  Id. at 874.  "The Supreme Court has long recognized that 'there is room for play in the joints' between the First Amendment's two clauses concerning religion: 'the government may . . . accommodate religious practices . . . without violating the Establishment Clause,' but '[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'  Cutter v. Wilkinson, 544 U.S. 709, 713–14, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (citations omitted).'"  Young v. Beard, 284 F. App'x 958, 963 (3d Cir. 2008).

Significantly, the Supreme Court has noted that, although provisions in penal

institutions might contravene the Establishment Clause, they would be sustained as necessary to secure the right to worship guaranteed by the Free Exercise Clause.  Dist. of Abington Township v. Schempp, 374 U.S. 203, 296–98, (1963) (Brennan, J., concurring). Thus, in the prison context, "the establishment clause has been interpreted in the light of the affirmative demands of the free exercise clause."  United States v. Kahane, 396 F.Supp. 687, 698 (2d Cir. 1975).

FCJ's religious practices policies have not crossed the threshold into "unlawful fostering."  In conformity with the *Lemon* test, the policies have a valid purpose because the Free Exercise Clause requires the government to make reasonable religious accommodation for its prisoners.  Hudson v. Palmer, 468 U.S. 517, 523–24 (1984).  The policies serve a secular purpose in that they comply with the legal requirements of the First Amendment; they neither advance nor inhibit religion since they gives inmates the option, but not the obligation to follow their faith; and they do not excessively entangle the government with religion but simply permit inmates to freely exercise their religious beliefs.  Defendants are therefore entitled to an entry of summary judgment on the Establishment Clause claim.


2.      Eighth Amendment

The Eighth Amendment protects prison inmates from cruel and unusual punishment. U.S. CONST. amend. VIII; see also Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, not all deficiencies or inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights.  Rhodes v. Chapman, 452 U.S. 337, 349 (1981).

To assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective and subjective test.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Specifically, a prisoner must show that (1) the alleged deprivation is "sufficiently serious" and (2) he has been deprived of the "minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834.  A prisoner must also show that "he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials possessed a "sufficiently culpable state of mind," demonstrating deliberate indifference to his health or safety.  Id. However, only extreme deprivations are sufficient to prevail on a claim for unconstitutional conditions of confinement.  See Hudson v. McMillian, 503 U.S. 1, 8–9 (1992).  Mere negligence or inadvertence will not satisfy the deliberate indifference standard and cannot constitute a violation of the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

For the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Farmer, 511 U.S. at 837).  Deliberate indifference has been found where a prison official:  "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason;

or (3) prevents a prisoner from receiving needed or recommended treatment." Rouse, 182 F.3d at 197.  Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).  Allegations of negligent treatment or medical malpractice do not trigger constitutional protections.  Estelle, 429 U.S. at 105–06.

Ealy alleges that the failure to allow him to sleep on his prayer rug, and the denial of medical treatment for sinus discomfort, violated his Eighth Amendment rights.  (Doc. 1, ¶¶ 24, VII(C)(2)).  Ealy does not oppose defendants' motion with respect to the Eighth Amendment claims in any fashion.  His failure to create any dispute of fact as to whether he has been deprived of the "minimal civilized measure of life's necessities" Farmer, 511 U.S. at 834, or that any of the defendants were deliberately indifferent to his serious medical needs, Rouse, 182 F.3d at 197, is fatal to his Eighth Amendment claim.  Accordingly, judgment will be entered in favor of defendants on the Eighth Amendment claims.

3.    Fourteenth Amendment

Ealy's equal protection claim is that "[t]he administration did provide the Jewish inmates with Kosher meals, and failed to provide Muslims with halal meals which we only represent 2 or 5 percent of the population." (Doc. 26, ¶ 11).  When an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious

27

groups, the governing standard is whether the disparate treatment is " 'reasonably related to legitimate penological interests.' " DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000).  The Turner analysis is equally applicable here.  Thus, the appropriate analysis is the same as that for Ealy's Free Exercise claim.  DeHart, 227F.3d at 61, citing Turner, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").

It is undisputed that Ealy's religious beliefs are sincerely held.  Clearly, absent a compelling interest, the state could not favor others and disfavor Ealy based on the character of his religious beliefs.  See Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir.1998) (holding that a classification that draws upon suspect distinctions, such as religion, "is subject to strict scrutiny and will pass constitutional muster only if it is narrowly tailored to serve a compelling state interest").  Nevertheless, Ealy cannot obtain relief if the difference between the defendants' treatment of him and their treatment of Jewish inmates is "reasonably related to legitimate penological interests."  See Clark v. Groose, 36 F.3d 770, 773 (8th Cir. 1994) (holding that in order for an inmate to recover on an equal protection claim, the inmate "must prove that the distinction between himself and the other inmates was not reasonably related to some legitimate penological purpose.").

With the exception of the purchase of pre-packaged kosher meals for Orthodox Jewish inmates, the dietary needs of the inmates of every religious sect represented within the facility are provided for under the General Plan or the Vegetarian/Vegan Plan.  (Id. at ¶ 51). The determination to purchase pre-packaged kosher meals was the most cost effective means

28

to provide for the dietary needs of Jewish inmates, given the prohibitive cost of creating and maintaining a kosher kitchen inside the FCJ.  (Id. at ¶ 52).  It is clear that the purchase of pre-packaged Kosher meals is reasonably related to the legitimate penological interest of cost effectiveness and containment.  Moreover, the record establishes that the General Plan comports with the Muslim religious diet guidelines as set forth by the United States Department of Justice in that it does not contain pork, pork by-products, or pork derivatives, and contains no blood, carnivorous animals, reptiles, or insects, and no alcohol.  (Doc. 17, ¶ 44).  Consequently, defendants have not denied Ealy the diet that his personal religious faith mandates.  Defendants are therefore entitled to an entry of summary judgment on the Equal Protection claim.

**IV.**    **<u>Conclusion</u>**

For all the reasons set forth herein, defendants' motion (Doc. 16) for summary judgment will be granted and judgment will be entered in favor of defendants and against plaintiff.

An appropriate order follows.


                                        **BY THE COURT:**


                                        **<u>s/James M. Munley</u>**
                                        **JUDGE JAMES M. MUNLEY**
                                        **United States District Court**


Dated:  March 31, 2015